**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 23-cv-4729 |
| | ) | |
| COLONY RIDGE DEVELOPMENT, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS COLONY RIDGE DEVELOPMENT, LLC, COLONY RIDGE BV, LLC,**
**AND COLONY RIDGE LAND, LLC'S MOTION TO DISMISS**

The claims brought against Colony Ridge Development, LLC and Colony Ridge BV, LLC (together, "Colony Ridge Development") and Colony Ridge Land, LLC ("Colony Ridge Land") (collectively, "Colony Ridge") by the Consumer Financial Protection Bureau ("CFPB") and the United States (together, "the Government") must be dismissed. The Government fails to state a cognizable violation of federal antidiscrimination law, and its attempts to do so are fatally flawed. The remaining claims, all brought by the CFPB alone, must be dismissed under binding Fifth Circuit precedent holding that the CFPB's unconstitutional funding structure renders it powerless to act. The complaint should be dismissed in its entirety.

## STATEMENT OF THE CASE

Colony Ridge offers customers on the lower rungs of the real estate market a chance at the American dream. With little or no money down and no credit history, customers can own a piece of land to develop over time as they see fit, providing them with the opportunity to build lasting, generational wealth.

The Colony Ridge defendants are, according to the Government, land developers operating in Liberty County, Texas. Compl. ¶¶ 1-2 (Dkt. 1). The Government alleges that the defendants have "developed more than 40,000 lots spread across six residential subdivisions (the Terrenos Houston Subdivisions) in Liberty County, Texas. . . . offer[ing] vacant lots for purchase and seller-financing to fund consumers' purchases." *Id.* ¶ 2. The Government further claims that the defendants "target[] . . . Hispanic consumers" for nonbank-financed mortgages that allegedly have "attracted financially vulnerable consumers with limited credit options and consumers who lacked or believe they lacked a credit history." *Id.* ¶¶ 9-10.

Even the Government recognizes that the defendants differ in meaningful ways. *See id.* ¶¶ 5, 7, 29, 64-65, 110. Colony Ridge Development allegedly develops raw land into lots, advertises the lots, and sells the lots. *Id.* ¶¶ 24-25, 32, 122, 133-34. Colony Ridge Land, on the other hand, does not sell lots: it allegedly sets mortgage loan terms, finances the buyer's purchase, services the loan once it is made, and handles any foreclosures. *Id.* ¶¶ 5, 7, 64-65. Another defendant company, Loan Originator Services, LLC, allegedly originates loans for Colony Ridge Land. *Id.* ¶ 65. The Government alleges that when Colony Ridge Land forecloses on lots it financed, the property returns to Colony Ridge Development's inventory for resale. *Id.* ¶¶ 122, 133-34.

The Government asserts the bare conclusion that the mortgages are a "predatory loan product." *Id.* ¶ 8. But the only facts alleged regarding the loans are that purchasers may choose among "loan repayment lengths, typically between 5 and 20 years," and from "a fixed interest rate of 10.9 percent, 11.9 percent, or 12.9 percent, depending on the down payment." *Id.* ¶¶ 71-72. In the Government's opinion, the loans have an "alarming default rate" and "set[] consumers up to fail," even though by their own reasoning, 70 percent or more of the loans succeed. *Id.* ¶¶ 1, 11,

13. Nevertheless, the Government alleges that defendants "benefit[] from . . . mortgage failures" via "high interest rates," "late fees," and "the down payments, mortgage payments, and other fees . . . collect[ed] for land that is often unusable to consumers" without additional expenditures for allegedly undisclosed infrastructure and drainage costs. *Id.* ¶¶ 4, 14, 123-26.

The Government asserts eleven claims. *Id.* ¶¶ 187-233. Nine of the eleven claims—Counts III through XI—are brought under the CFPB's authority alone. *Id.* ¶¶ 198-233. One claim—Count I—is brought under the joint authority of the CFPB and the United States for alleged violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and Regulation B to that Act promulgated and enforced by the CFPB, 12 C.F.R. Part 1002. *Id.* ¶¶ 187-91. The sole remaining claim—Count II—is brought under the United States's authority for alleged violations of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, and regulations promulgated by the Department of Housing and Urban Development, 24 C.F.R. Part 100. *Id.* ¶¶ 192-97.

## LEGAL STANDARD

Claims must be dismissed under Federal Rule of Civil Procedure 12(b)(6) unless a plaintiff pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A plaintiff must provide the grounds of its entitlement to relief, which "requires more than labels and conclusions," as the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Neither the "formulaic recitation of the elements of a cause of action," *id.*, nor "conclusory allegations or legal conclusions masquerading as factual conclusions" will suffice to defeat a motion to dismiss. *Nix v. Major League Baseball*, 62 F.4th 920, 928 (5th Cir. 2023) (cleaned up). Dismissal under Rule 12(b)(6) is also proper for "fail[ure] to allege a cognizable legal theory." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 814 (S.D. Tex. 2017). Dismissal can thus "be based either on a lack of a cognizable

legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 737-38 (S.D. Tex. 1998).

## ARGUMENT AND AUTHORITIES

Each claim in the Complaint must be dismissed: the first two because they rest on plainly defective legal arguments under ECOA and the FHA, and the rest because binding Fifth Circuit precedent forecloses the CFPB's attempt to bring an action in the first place.

### I.   Count I (ECOA) Should Be Dismissed for Failure to State a Claim.

#### A.  The Government has not plausibly alleged action prohibited by ECOA.

The ECOA claim should be dismissed because the Government fails to allege each element of their claim and because the legal theory on which the Government relies is not cognizable. To state a claim under ECOA, a plaintiff must allege that "(1) she is a member of a protected class; (2) she applied for credit with defendants; (3) she qualified for credit; and (4) she was denied credit despite being qualified." *Hafiz v. Greenpoint Mortg. Funding, Inc.*, 652 F. Supp. 2d 1039, 1045 (N.D. Cal. 2009) (citing, *inter alia*, *Moore v. U.S. Dep't of Agric.*, 55 F.3d 991, 994 (5th Cir. 1995)). First, the Government never alleges that the defendants denied credit to any applicant, which is reason enough to dismiss the ECOA claim. *See Greer v. Home Realty Co. of Memphis, Inc.*, No. 07-2639, 2008 WL 11318325, at *21 (W.D. Tenn. Aug. 7, 2008) (ECOA claim requires dismissal if the plaintiff "was not denied credit") (citing *Downs v. Clayton Homes, Inc.*, 88 F. App'x 851, 854 (6th Cir. 2004)). Second, it is debatable at best whether the Government satisfies the first three elements of an ECOA claim—for example, the Government nowhere identifies a "protected class" that the Colony Ridge Development defendants allegedly targeted.

In an effort to salvage its claims, the Government relies on a theory of "'reverse redlining' or 'targeted predatory lending,'" which it describes as the "discriminatory targeting" of loans in a manner barred by ECOA. Compl. ¶ 154. In other words, rather than challenging the denial of

credit, a "reverse redlining" theory blames a potential defendant for *extending* credit to a protected class of land buyers. Neither the U.S. Supreme Court nor the Fifth Circuit has recognized such a claim; this Court should likewise decline to do so.

"ECOA was implemented to ensure that applicants have an *equal opportunity to obtain credit*." *Hafiz*, 652 F. Supp. 2d at 1045. In *Hafiz*, for example, the plaintiff failed to plausibly allege discrimination under ECOA because she never explained how "her approval for extra credit would be discriminatory or . . . provide any factual basis for her conclusions" that "she was approved for (and thereafter accepted) more credit than she applied for because she was a Fijian, rather than Caucasian, female." *Id.* Because the Government alleges that land purchasers were undisputedly provided "*access* to credit," the ECOA claim in this case should similarly be dismissed. *Id.*

Nor can the Government cure this defect through Regulation B. *See* Compl. ¶ 188 (citing 12 C.F.R. § 1002.4(a)). That rule provides that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction." 12 C.F.R. § 1002.4(a). The purpose of Regulation B is to "promote the availability of credit to all creditworthy applicants without regard to race . . . [or] national origin," and to "prohibit[] creditor practices that discriminate on the basis of any of these factors." *Id.* § 1002.1(b). The Government alleges no denial of credit, let alone plausible allegations of discrimination on any basis in the terms offered to land purchasers. The only basis on which loans were allegedly offered on differing terms is that buyers received a different fixed interest rate "depending on the down payment." Compl. ¶ 72. Because a down payment is not a "prohibited basis" listed under ECOA or Regulation B, the Government's reverse redlining theory—and therefore its ECOA claim—fails as a matter of law.

**B. The Government has not plausibly alleged that any credit terms were grossly unfavorable or that any terms were offered on prohibited grounds.**

Even assuming that a "reverse redlining" theory is cognizable under ECOA, there are

insufficient allegations to support it. Insofar as such a claim potentially exists, it would require a plaintiff to plausibly allege, at a minimum, "(1) that [he] is a member of a protected class; (2) that [he] applied and was qualified for a loan; (3) that the loan was given on grossly unfavorable terms; and (4) that the lender either intentionally targeted [him] for unfair loans or currently makes loans on more favorable terms to other." *Jones v. Caliber Home Loans, Inc.*, No. 18-1023-SDD-EWD, 2019 WL 3366104, at *6 (M.D. La. July 24, 2019) (citation omitted). Thus, a plaintiff has no plausible "reverse redlining" claim under ECOA unless he also alleges which comparable loans were available to him (if at all). *E.g.*, *id.* (dismissing ECOA claim because plaintiff "failed to provide any factual details beyond his own credit score which was accompanied by a legal conclusion that his score qualified him for more favorable terms").

Without such facts, a plaintiff cannot state a plausible *prima facie* claim of discrimination under ECOA, and the claim must be dismissed. *See Montano-Valdez v. Wells Fargo Bank, N.A.*, No. H-13-3078, 2014 WL 69886, at *2 (S.D. Tex. Jan. 8, 2014) (Rosenthal, J.) ("[The ECOA plaintiff did] not allege any specific facts showing that she qualified for the loan modification she sought, or that others who were similarly situated but outside her protected class received the loan she was denied. Courts addressing motions to dismiss similar allegations have found pleadings too conclusory and skeletal to proceed.") (collecting cases); *Vasquez v. Bank of Am., N.A.*, No. 13-cv-02902-JST, 2013 WL 6001924, at *13 (N.D. Cal. Nov. 9, 2013) ("[An ECOA Plaintiff] must also allege specific facts, not mere conclusory assertions, demonstrating that [plaintiff] was "qualified for credit."); *Bojorquez v. Wells Fargo Bank, N.A.*, No. 6:12-cv-2077-AA, 2013 WL 6055258, at *6 (D. Or. Nov. 7, 2013) ("[B]eyond merely concluding that they were 'refus[ed] the loan for which [they were] qualified,' plaintiffs do not . . . allege any facts demonstrating that they were, in fact, eligible for credit and nonetheless denied.").

Merely alleging that plaintiffs "were offered terms and conditions less favorable than they 'should have' qualified for" will not suffice. *Woodworth v. Bank of Am., N.A.*, No. CIV. 09-3058-CL, 2011 WL 1540358, at *19 (D. Or. Mar. 23), *report and recommendation adopted sub nom. Woodworth v. Bank of Am.*, No. CIV. 09-3058-CL, 2011 WL 1542514 (D. Or. Apr. 21, 2011). An ECOA claim must be dismissed when plaintiffs have "failed to plead facts demonstrating that they were qualified for any loan other than the one they received." *Id.* As in *Woodworth*, the Government fails to allege that individuals would have qualified for any loan other than the one they received. The Court should thus dismiss Count I for failure to state a claim.

Alternatively, the ECOA claim must be dismissed because the Government fails to allege which specific credit terms were unlawful. Even assuming that the Government's "reverse redlining" theory is cognizable, courts have dismissed similar ECOA claims unless plaintiffs also allege that defendants provided loans on "grossly unfavorable" terms. *Jones v. Wells Fargo Bank, NA*, No. EDCV 10-01399-CJC(DTBx), 2011 WL 13224821, at *5 (C.D. Cal. Jan. 28, 2011) (quoting *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 876 (N.D. Cal. 2010)). In *Jones*, for example, the court ruled in the alternative that an untimely ECOA claim should be dismissed because although the plaintiff "alleged that her loan contained unfavorable terms, she [had] not provided sufficient factual detail to demonstrate that those terms were 'grossly unfavorable.'" *Id.* (citation omitted). Here, the Government's allegations suffer similar fatal defects. The Government offers "no more than 'formulaic recitation[s] of the elements of a cause of action," *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 706-07 (5th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678-79), and never alleges that any loan terms were grossly unfavorable in whole or in part.

The Government does not even attempt to claim that any loan terms were "unfair" at all.

*Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000). The Government alleges only that Colony Ridge Land's interest rates—offered at 10.9%, 11.9% or 12.9%, depending solely on the down payment amount—were "significantly higher than typical prevailing rates." Compl. ¶¶ 72-73. This proposition independently fails because the Government equates Colony Ridge Land's interest rates for lot purchases with the interest rates for conventional "home loans." *Id.* ¶ 73. Not only is this comparison intolerably inaccurate because the loan products are so dissimilar, it is also clumsily applied. The Government appears to ignore differences between a conventional home loan (secured by a mortgagor-buyer who immediately and personally occupies the existing structure on the property, and often backed by various government programs) versus a private lot loan from a fully private lender (for land with no such immediately livable structure, meaning the buyer is not as tied to the property). The Government's invocation of "typical prevailing rates" for home loans fails to recognize the comprehensive underwriting standards that are required on conventional home loans but that are not required for private sales of land.

Moreover, a bank, unlike a private lender, "is interested in its yield on the loan amount and the risk it will incur in connection with the loan in comparison with the market interest rate," resulting in terms that "frequently differ" between bank loans and nonbank loans. *In re Club Assocs.*, 107 B.R. 385, 403 (Bankr. N.D. Ga. 1989), *aff'd*, 956 F.2d 1065 (11th Cir. 1992). The Court should not accept that the lot loan terms at issue here are comparable to conventional government-backed home-loan terms, or that such loans were even available at all. The Government falls entirely short of demonstrating that privately financed lot loans are equivalent to home loans generated by conventional government-backed bank lenders, which are dissimilar credit products that cannot be compared by interest rate alone. Nor does the Government compare other lot loans (whether bank-financed or not) to the lot loans in this case, which are issued with

interest rates far below the maximum rate of 18% set by the Texas Office of Consumer Credit Commissioner. *See* Tex. Fin. Code §§ 303.008, .009(a). In short, the Government has not pleaded necessary facts to plausibly claim that the lot loan terms here are grossly unfavorable.

The Government also fails to plausibly allege that any aspect of a credit transaction occurred on a prohibited basis. ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction." 15 U.S.C. § 1691(a)(1). The Government appears to allege race and national-origin discrimination based on offering purportedly "predatory" financing. Compl. ¶ 188. Yet the Government identifies no aspects of the credit transaction (as opposed to alleged sales practices) that it contends are discriminatory; indeed, the Government admits that the loans here are offered on the exact same terms to everyone. *See id.* ¶¶ 71-72, 74, 78-81. Merely reciting that deceptive sales conduct occurred—even if true—without more, does not allege a financing violation under ECOA. *See Alexander*, 848 F.3d at 706-07; *see also Brook v. Sistema Universitario Ana G. Mendez, Inc.*, No: 8:17-cv-171-T-30AAS, 2017 WL 1743500, at *3 (M.D. Fla. May 4, 2017) (mere allegation that plaintiff borrowed over $40,000 in student loans failed to plausibly allege that any aspect of a credit transaction—as opposed to her university's allegedly fraudulent enrollment tactics—were discriminatory). The Government fails to identify any aspect of a credit transaction that is discriminatory.

### C. The Government has not plausibly alleged either a disparate-treatment or disparate-impact claim.

Even if the Government's "reverse redlining" theory were cognizable, district courts within the Fifth Circuit have explained that such claims require plausible allegations of discrimination. Discrimination based on race can be "demonstrated by either 'a showing of a significant discriminatory effect' or 'proof of discriminatory intent,' that is disparate impact or discriminatory treatment." *Jones*, 2019 WL 3366104, at *4 (citing *L&F Homes & Dev., L.L.C. v. City of Gulfport*,

538 F. App'x 395, 400 (5th Cir. 2013) (per curiam)). The Government fails to allege either one.

 "Disparate treatment" is established by evidence of "deliberate discrimination." *L&F Homes*, 538 F. App'x at 400 (quoting *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000)). "Such discrimination is shown by evidence of discriminatory action or by inferences from the 'fact of differences in treatment.'" *Id.* (citation omitted). The Government fails fundamentally on this account. Nowhere does the Government claim that any defendant sells or finances sales on different terms on the basis of race or national origin. Rather, the Government *admits* that the terms under which defendants are willing to sell and lend are the same for everyone. *See* Compl. ¶¶ 71-72, 74, 78-81, 157, 188. The interest rate that a borrower pays is controlled solely by the down payment at closing—not by some discretionary decision, let alone a policy discriminating against Hispanics (or anyone else) on the basis of race. This failure to even *allege* disparate treatment—let alone to do so plausibly—requires dismissal.

The Government never attempts to allege a disparate-impact claim. "[D]isparate-impact claims 'involve [policies or] practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *L&F Homes*, 538 F. App'x at 400 (citation omitted). Beyond merely alleging the existence of a disparate impact, the plaintiff must "identify a 'specific test, requirement, or practice' that is responsible for the disparity." *Id.* (citation omitted).

Here, the Government alleges that the percentage of Hispanic buyers in the Terrenos Houston Subdivisions exceeds the percentage of Hispanic residents in the Houston Metropolitan Statistical Area. Compl. ¶ 10. Even if that is true, the Government does not identify a "specific neutral practice or policy" that allegedly "'falls more harshly' on a protected group than on others," which means that "the disparate-impact theory is inapplicable." *L&F Homes*, 538 F. App'x at 400

(citation omitted). Nor has the Government alleged any "test, requirement, or practice" responsible for any disparity. *Id.* (citation omitted). The Government merely alleges that defendants "attract Hispanic consumers." *Id.* ¶ 3. Yet the Government does not allege that defendants collect data regarding the race or ethnicity of land buyers or mortgage applicants, or that Congress or the CFPB have ever required lenders to collect the race and ethnicity of applicants for lot loans.

Instead, the Government offers a bare assertion of "targeting Hispanic applicants" that fails to plausibly state a claim. *Id.* ¶ 188. Some courts have allowed plaintiffs to show discrimination through proof that defendants "provide 'significantly more favorable" loans to other similarly-qualified non-[protected-class] applicants, through either intentional targeting or disparate treatment." *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 292 n.33 (S.D.N.Y. 2011) (citations omitted). Even accepting the Complaint's characterizations, however, the Government fails to "'articulate facts which, if taken as true, would demonstrate that actions" regarding "terms, conditions, or any aspect of a credit transaction" were "taken against [borrowers] as a result of racial . . . discrimination." *Jones*, 2019 WL 3366104, at *5-6 (citation omitted). Merely alleging that a group of borrowers was "targeted for an onerous loan" is "far too conclusory" to plausibly state a claim under ECOA. *Ng v. HSBC Mortg. Corp.*, No. 07-CV-5434, 2010 WL 889256, at *11 (E.D.N.Y. Mar. 10, 2010). Because such "targeting" claims "involve, at heart, 'differential treatment of similarly situated persons or groups," a complaint must be dismissed if it lacks "specific factual allegations that tend to show how [the plaintiff] was treated any differently from similarly situated home buyers." *Id.* Because the Government fails to allege how any Hispanic applicants were treated differently from any similarly situated home buyers, the Government fails to state a claim under ECOA.

**D. The Government has not plausibly alleged that each defendant is a creditor subject to ECOA.**

At a minimum, the Colony Ridge Development defendants are not "creditors" within ECOA's scope, and Regulation B—as numerous courts have recognized—is plainly invalid to the extent it attempts to expand that scope. ECOA provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). Under ECOA, the "complaint must plausibly allege that (1) each plaintiff was an 'applicant'; (2) the defendant was a 'creditor'; and (3) the defendant discriminated against the plaintiff with respect to any aspect of a credit transaction on the basis of the plaintiff's membership in a protected class." *Alexander*, 848 F.3d at 705. ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). An "applicant" under ECOA is, in relevant part, "any person who applies to a creditor . . . for an extension . . . of credit." *Id.* § 1691a(b).

Even by the Government's telling, the Colony Ridge Development defendants' alleged land-development activities involve none of these requirements. *See* Compl. ¶¶ 24-25, 32, 122, 133-34. The Government alleges nothing plausibly supporting its claims against the Colony Ridge Development defendants as a *creditor* on this count. Rather, the Government attempts to broaden ECOA's reach by relying on unlawfully expansive CFPB regulatory definitions. *See* Compl. ¶ 160. In contrast to the Act itself, Regulation B defines a "creditor" to "include[] a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made." 12 C.F.R.

§ 1002.2(*l*). Of course, as explained further below, the CFPB's unconstitutional funding structure renders any reliance on CFPB regulatory authority invalid. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 643-44 (5th Cir. 2022), *cert. granted sub nom. CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 143 S. Ct. 978 (2023). But even if the Government could rely on Regulation B, that regulation does not save its claims.

Courts have repeatedly rejected attempts to expand ECOA through regulations such as Regulation B. *See Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1193 (11th Cir. 2019); *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 942 (8th Cir. 2014); *Moran Foods v. Mid-Atl. Market Dev. Co.*, 476 F.3d 436, 441 (7th Cir. 2007). As one court recently ruled, Regulation B improperly expands ECOA's statutory coverage because Congress already spoke "clearly and unambiguously" in defining the statutory reach. *Bureau of Consumer Fin. Prot. v. Townstone Fin., Inc.*, No. 20-cv-4176, 2023 WL 1766484, at *5 (N.D. Ill. Feb. 3, 2023) (applying *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), to related definition of "applicant"). ECOA "unambiguously foreclose[s]" the Government's reliance on Regulation B to argue that the Colony Ridge Development defendants are "creditors," which is the "end of the matter." *Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1023 (5th Cir. 2019) (citation omitted).

## II. Count II (FHA) Should be Dismissed for Failure to State a Claim.

Count II should likewise be dismissed because the United States fails to allege a plausible FHA claim. The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race . . . or national origin," and also forbids "discriminat[ing]" against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race . . . or national origin." 42 U.S.C. § 3604(a)-(b). The FHA also makes it unlawful for "any person or other entity whose business includes engaging in residential real estate-related

transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . or national origin." *Id.* § 3605(a).

Like the Government's ECOA claim, the United States alleges that defendants engage in unlawful discrimination by "targeting Hispanic applicants on the basis of race or national origin with predatory seller financing and exploiting applicants' limited English proficiency." Compl. ¶ 193. Because the Complaint's allegations supporting the alleged FHA violation mirror the deficient ECOA claim, Count II must be dismissed as well. Finally, the FHA does not cover the alleged lot purchases or, at a minimum, does not encompass each alleged violation on which the United States relies.

### A.  The FHA claim must be dismissed because it relies on a "reverse redlining" ECOA claim that fails as a matter of law.

The FHA claim should be dismissed for similar reasons requiring dismissal under ECOA. The United States asserts that, "[l]ike ECOA, the FHA prohibits discriminatory targeting in residential loans and related services." Compl. ¶ 162. The United States alleges that defendants' "acts and practices constitute unlawful discrimination, including by targeting Hispanic applicants on the basis of race or national origin with predatory seller financing and exploiting applicants' limited English proficiency, in violation of the FHA." *Id.* ¶ 193. The FHA claim thus mirrors the same "reverse redlining" theory supporting the ECOA allegations. *See id.* ¶ 154 (describing "discriminatory targeting" as "'reverse redlining' or 'targeted predatory lending.'"). Because "reverse redlining" is an extra-statutory legal theory that is unmoored from the statutory text and has not been recognized by the Fifth Circuit, the FHA claim should be dismissed because Complaint fails to state a plausible ECOA claim for the reasons explained above.

### B.  The United States has not plausibly alleged facts necessary to state an FHA claim.

The United States's FHA claim fails for the same reasons as its ECOA claim. Courts have

indicated that a single analysis is dispositive of claims of alleged "reverse redlining" under both statutes. *See, e.g.*, *Jones*, 2019 WL 3366104, at *6; *Williams v. 2000 Homes Inc.*, No. 09-CV-16(JG)(JMA), 2009 WL 2252528, at *6 (E.D.N.Y. July 29, 2009) (failure of "reverse redlining" FHA claim also required dismissal of ECOA claim). Thus, even assuming that the FHA encompasses "reverse redlining," the United States never plausibly alleges "(1) that [each buyer] is a member of a protected class; (2) that [each buyer] applied and was qualified for a loan; (3) that the loan was given on grossly unfavorable terms; and (4) that the lender either intentionally targeted [each buyer] for unfair loans or currently makes loans on more favorable terms to others." *Jones*, 2019 WL 3366104, at *6 (citation omitted).

Courts—including those within the Southern District of Texas—have dismissed claims that fail to include such allegations. In *Montano-Valdez*, for example, the court dismissed an FHA claim where the plaintiff failed to "allege any specific facts showing that she qualified for the loan modification she sought, or that others who were similarly situated but outside her protected class received the loan modification she was denied." 2014 WL 69886, at *2. "Courts addressing motions to dismiss similar allegations have found the pleadings too conclusory and skeletal to proceed." *Id.* (citing *Pitre v. U.S. Bank N.A.*, No. H-10-cv-1020 (MH), 2011 WL 5449767, at *4 (S.D. Tex. Nov. 9, 2011); *Atkins v. Litton Loan Serv., LLP*, No. 10-00561-EDL, 2011 WL 3878378, at *9 (N.D. Cal. Sept. 1, 2011); *Grimes*, 785 F. Supp. 2d at 292 n.33; *Woodworth*, 2011 WL 1540358, at *19; *Davenport*, 725 F. Supp. 2d at 876; *Hafiz*, 652 F. Supp. 2d at 1046.

Several of these FHA cases are particularly instructive. For example, in *Pitre*, the court dismissed an FHA claim because the plaintiff "failed to allege any set of facts that support his assertion that Defendants engaged in redlining, or any other discriminatory conduct, on the basis of race." 2011 WL 5449767, at *4. Also, the plaintiff "demonstrated no more favorable loan

options that might have been available to him but for a discriminatory practice and has alleged no basis for his belief that Defendants discriminated against him other than his dissatisfaction with the terms of his mortgage." *Id.* And in *Woodworth*, the district court dismissed a "reverse redlining" FHA claim because the plaintiffs failed to plead facts showing that they were "qualified for any loan other than the one their received" or that any "discriminatory animus motivated the defendants' conduct." 2011 WL 1540358, at *19. The United States here likewise fails to state a claim because such allegations are absent in the Complaint.

In any event, the United States's allegations are too generalized to state a plausible claim. In *Grimes*, for example, the plaintiffs' untimely FHA claim also suffered "serious deficiencies on the merits" because they "fail[ed] to plead that any specific similarly-situated non-African American applicant received a better loan." 785 F. Supp. 2d at 292 n.33. Nor were there specific allegations that "'significantly more favorable' loans" were offered to similarly qualified non-African American applicants through "intentional targeting or disparate treatment." *Id.* (citation omitted). That is likewise the case here, where the United States does not allege that any group was offered different loan terms compared to any other group. Thus, even assuming counterfactually that a "reverse redlining" claim is cognizable in this Circuit, without additional allegations evidencing a difference in the loan terms offered to a protected class, the FHA claim here suffers from the same fatal deficiencies.

### C. The United States does not plausibly allege that the FHA covers all lots at issue.

Even if "reverse redlining" were cognizable and plausibly supported (it is not), Count II must be dismissed because the United States has not plausibly alleged facts indicating that the lots at issue are subject to the FHA. The relevant FHA provisions apply only to "dwellings." 42 U.S.C. §§ 3604(a)-(b), 3605(a). A "dwelling" means "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and

16

any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." *Id.* § 3602(b).

The United States summarily alleges that "[t]he lots in the Terrenos Houston Subdivisions are 'dwellings' under the FHA." Compl. ¶ 165. But that contention is "'alleged in far too conclusory a fashion to satisfy the current pleading requirements' of *Iqbal* and *Twombly* and . . . [reflects] 'little more than buzzwords and conclusory labels, in the absence of the requisite factual allegations.'" *Grimes*, 785 F. Supp. 2d at 292 n.33 (quoting *Ng*, 2010 WL 889256, at *11-12 (dismissing FHA "reverse redlining" claim on other grounds)). The FHA may apply to "vacant land," but only when "offered for sale or lease" as a "residence." 42 U.S.C. § 3602(b). The FHA thus requires dismissal where, for example, vacant land is purchased for non-residential or commercial purposes. *Home Quest Mortg. LLC v. Am. Fam. Mut. Ins. Co.*, 340 F. Supp. 2d 1177, 1184-87 (D. Kan. 2004) (collecting cases and dismissing FHA claims concerning non-residential property). Specifically, the FHA does not apply to a "person who owns residential property as a commercial venture." *Id.* at 1186. The United States alleges that defendants advertise "that lots in the Terrenos Houston Subdivisions are homesites or building lots" and the opportunity to "have properties of any type," including a "house" or "mobile home." Compl. ¶¶ 56-59. But such allegations do not, for instance, rule out non-residential or commercial uses. *See Home Quest*, 340 F. Supp. 2d at 1186. They are thus insufficient to support the conclusory assertion that all of the "lots in the Terrenos Houston Subdivisions are 'dwellings' under the FHA." Compl. ¶ 165. The United States therefore cannot prove its claims as alleged.

### D.  The United States fails to state a claim under 42 U.S.C. § 3604(a).

At a minimum, Count II should be dismissed insofar as it relies on 42 U.S.C. § 3604(a). *See* Compl. ¶ 194. The United States alleges no facts that could plausibly show "the making unavailable or denial of dwellings to persons because of race and national origin, in violation of

the FHA and its implementing regulation." *Id.* (citing 42 U.S.C. § 3604(a); 24 C.F.R. § 100.50(b)(3)). Allegations that defendants "target[ed] Hispanic applicants" by *extending* them financing to purchase property, *e.g.*, *id.* ¶ 193, facially contradict any plausible inference that any defendant "ma[de] unavailable or deni[ed]" anything to anyone, 42 U.S.C. § 3604(a); 24 C.F.R. § 100.50(b)(3). And insofar as courts have permitted "reverse redlining" claims to proceed under the FHA, section 3604(a) provides no basis for doing so. *See, e.g.*, *Eva v. Midwest Nat'l Mortg. Bank, Inc.*, 143 F. Supp. 2d 862, 886 (N.D. Ohio 2001) (dismissing "reverse redlining" claim under section 3604(a)). The United States's section 3604(a) claim must likewise be dismissed.

## III.   All Claims Brought by the CFPB Must Be Dismissed for Failure to State a Claim.

### A.   Binding Fifth Circuit precedent requires dismissal of all CFPB claims.

The Court should dismiss all claims brought by the CFPB. On October 19, 2022, a Fifth Circuit panel issued its opinion in *CFSA v. CFPB*. The panel held that the CFPB's statutory funding mechanism violates the Appropriations Clause and the constitutional separation of powers. *CFSA*, 51 F.4th at 635-42. As a result, the CFPB's enforcement authority as well as its rules and regulations are currently subject to challenge. Stated plainly, any CFPB action which requires the expenditure of funds from its current funding mechanism is voidable. *Id.* at 643 ("[W]ithout its unconstitutional funding, the [CFPB] lacked any other means to promulgate the rule.").

In February 2023, the U.S. Supreme Court granted certiorari review of the Fifth Circuit's decision in *CFSA v. CFPB*. The Supreme Court heard argument in October 2023 and is expected to rule by June 2024. *See CFSA v. CFPB*, 143 S. Ct. 978. "The grant of certiorari does not change the fact that CFSA remains binding precedent . . . unless and until the Supreme Court says otherwise." *Collins v. Dep't of the Treasury*, 83 F.4th 970, 982 n.11 (5th Cir. 2023).

Thus, unless and until the Fifth Circuit opinion is reversed or amended, the panel decision

in *CFSA v. CFPB* binds this Court. Each cause of action brought pursuant to authority granted to the CFPB must be dismissed according to that binding precedent. *See* Compl. ¶ 20 ("The Bureau is authorized to bring civil actions in federal district court . . . to address violations of federal consumer financial laws, and to 'seek all appropriate legal and equitable relief,' including injunctive relief, refund of monies paid, damages, restitution, disgorgement, and civil money penalties." (quoting 12 U.S.C. §§ 5564(a)-(b), 5565(a)(2)). Any attempt by the CFPB to bring actions in its own name is void under *CFSA v. CFPB* and the CFPB's claims must be dismissed. *See, e.g.*, *Angers ex rel. Angers v. Lafayette Consol. Gov't*, No. 07-0949, 2007 WL 2908805, at *1 (W.D. La. Oct. 3, 2007) (citing Fifth Circuit precedent suggesting that defect in capacity for suit is grounds for dismissal under Rule 12(b)(6)) (citing *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 314 (5th Cir. 1991)).

**B. Alternatively, the Court may await the Supreme Court's ruling in *CFSA v. CFPB* before ruling on the CFPB's claims.**

Alternatively, and as indicated in the pending request for a stay, ECF No. 45, a stay of litigation is appropriate in view of *CFSA v. CFPB*. The Supreme Court opinion addressing the CFPB's authority is expected no later than June 2024 and anything less than a full reversal of the Fifth Circuit's opinion will necessarily impact the scope of this case and could render discovery and motion practice on certain CFPB claims irrelevant or improper. Because the Government's claims and the defenses thereto will be informed by the upcoming Supreme Court opinion, there is good cause for a stay. But if the Court is not inclined to grant a stay, the Court may alternatively wish to await the Supreme Court's ruling in *CFSA v. CFPB*, receive additional briefing on the decision, and rule on the dismissal of CFPB's claims at that time.

# PRAYER

The Colony Ridge Development defendants and Colony Ridge Land request that the Court reject the Government's claims in their entirety and enter a judgment of dismissal on all claims.

Dated: February 20, 2024                    Respectfully submitted.

<table>
<tr>
<td>

Philip H. Hilder
Texas Bar No. 09620050
Q. Tate Williams
Texas Bar No. 24013760
Stephanie K. McGuire
Texas Bar No. 11100520
**HILDER & ASSOCIATES, P.C.**
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
philip@hilderlaw.com
tate@hilderlaw.com
stephanie@hilderlaw.com

</td>
<td>

*/s/ Christopher D. Hilton*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
(737) 465-3897-telephone
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com

Jason Ray
Texas Bar No. 24000511
**RIGGS & RAY P.C.**
3307 Northland Drive, Suite 215
Austin, Texas 78731
(512) 457-9806- telephone
jray@r-alaw.com

***Attorneys for Defendants Colony Ridge
Development, LLC, Colony Ridge BV, LLC,
and Colony Ridge Land, LLC***

</td>
</tr>
</table>

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 20, 2024, counsel for the parties conferred regarding this Motion and the substance of the relief requested, and plaintiffs' counsel indicated they are opposed to the relief requested.

/s/ Christopher D. Hilton
Christopher D. Hilton

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of this document on the below-listed counsel of record, using the CM/ECF system on this, the 20th day of February 2024.

Mellisa A. Carrington
Terrence K. Mangan, Jr.
Jimmy S. McBirney
Hannah C. Abelow
**U.S. Department of Justice**
150 M. Street, NE
Washington, DC 20530

Elizabeth F. Karpati
Assistant U.S. Attorney
1000 Louisiana, Suite 2300
Houston, TX 77002

*Attorneys for Plaintiff*
*United States of America*

E. Vanessa Assae-Bille
Alexis C. Christensen
Andrea M. Lowe
**Consumer Financial Protection Bureau**
1700 G Street, NW
Washington, DC 20552

*Attorneys for Plaintiff*
*Consumer Finance Protection Bureau*

Robert G. Hargrove
Lisa A. Paulson
**DAVIS, GERALD & CREMER, P.C.**
515 Congress Avenue, Suite 1510
Austin, Texas 78701

*Attorneys for Defendant*
*Loan Originator Services, LLC*

/s/ Christopher D. Hilton
Christopher D. Hilton

21