**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and<br><br>UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>v.<br><br>COLONY RIDGE DEVELOPMENT, LLC, d/b/a Terrenos Houston, Terrenos Santa Fe, and Lotes y Ranchos;<br><br>COLONY RIDGE BV, LLC;<br><br>COLONY RIDGE LAND, LLC, formerly d/b/a Terrenos Houston and Lotes y Ranchos; and<br><br>LOAN ORIGINATOR SERVICES, LLC,<br><br>Defendants. | Civil Action No. 4:23-cv-4729<br><br>Judge Alfred H. Bennett |

**PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO**
**LOAN ORIGINATOR SERVICES, LLC'S MOTION TO DISMISS**

## I. Introduction

Since at least 2016, Loan Originator Services, LLC (LOS or Defendant) has originated every single predatory, seller-financed mortgage that Defendants Colony Ridge Development, LLC, Colony Ridge BV, LLC, and Colony Ridge Land, LLC (collectively, the Colony Ridge Defendants) have extended to the Hispanic consumers they targeted. Despite this undeniable connection to the Colony Ridge Defendants and the unlawful conduct alleged in the Complaint, LOS asks this Court to allow it to avoid liability at the pleading stage. Because Plaintiffs have alleged plausible discrimination claims under the Equal Credit Opportunity Act (ECOA) and the Fair Housing Act (FHA) against LOS, the Court should reject LOS's efforts to evade liability and deny LOS's motion to dismiss in its entirety.

## II. Procedural Background

On December 20, 2023, the Consumer Financial Protection Bureau (Bureau) and the United States of America (United States) (collectively, Plaintiffs) filed a Complaint alleging that, among other violations, LOS and the Colony Ridge Defendants (together, Defendants) engaged in an intentional and willful pattern or practice of violating ECOA, 15 U.S.C. § 1691(a)(1), with reckless disregard for the rights of individuals based on their race or national origin. ECF at 1; ¶¶ 187–91. Specifically, the Complaint alleges that Defendants target Hispanic consumers with a predatory loan product that sets them up to fail and, indeed, results in an alarming rate of foreclosures. *Id.* at 1; ¶¶ 11–12. The United States separately alleges that this intentional and willful pattern or practice of discrimination on the basis of race or national origin also violates the FHA, 42 U.S.C. §§ 3604(a)-(b), 3605. *Id.* at 1 ¶¶; 192–96. The Bureau further alleges that the violation of ECOA results in a violation of the CFPA, 12 U.S.C. §§ 5531, 5536. *Id.* at 1; ¶¶ 228–29. On February 20, 2024, LOS moved to dismiss all claims against it. ECF 49.

## III. Factual Background

LOS has been licensed to originate loans in Texas as a non-depository mortgage company since at least January 2014, and has served as the Colony Ridge Defendants' exclusive loan originator since at least 2016. ECF 1 ¶¶ 31, 65. LOS derives substantial benefit from this arrangement: indeed, if LOS collected only its minimum $100 origination fee per lot sale on the 28,482 transactions[1] alleged from September 2017 and September 2022, LOS would have gained $2,848,200 from this predatory scheme. *Id.* ¶¶ 10, 110.

LOS's participation in the credit extension process is essential to the Colony Ridge Defendants' business. Significantly, LOS uses its loan origination license to issue loans for Colony Ridge Land. *Id.* ¶¶ 31, 110. As originator of each of the tens of thousands of loans at issue, LOS is also responsible for tasks critical to closing on each transaction, including generating pre-closing documents, entering consumer information into documents, reviewing

[1] This is a conservative estimate of the total sales that occurred during this three-year period as Plaintiffs counted consumers who purchased one or more properties on the same day only once.

transactional documents, and signing key documents like the Application for Financing and Texas Mortgage Company Disclosures. *Id.* ¶¶ 110, 113–14. LOS also plays a key role in the transactions by creating customer-facing disclosures (in English only) that the Colony Ridge Defendants, in turn, provide to consumers. *Id.* ¶¶ 90, 113, 118. LOS also provides weekly data to Colony Ridge regarding the interest rate, loan term, and monthly payment for each lot on sale. *Id.* ¶ 112. In fact, LOS plays such a critical role and derives so much business from working with Colony Ridge that its Managing Member maintained an office dedicated solely to her work for the Colony Ridge Defendants in the very building where the Colony Ridge Defendants complete the land sales and credit transactions. *Id.* ¶ 111.

Importantly, LOS directly participates in Defendants' predatory seller financing practices. Like the Colony Ridge Defendants, LOS does nothing to assess consumers' ability to afford the credit that it originates: at no stage does LOS collect verified information regarding consumers' income and assets, or about their debts and liabilities. *Id.* ¶¶ 80–81, 88–89, 115–16. Given that Defendants make no effort to determine whether consumers can afford to repay these loans, which typically run in the tens of thousands of dollars, it is no wonder that the transactions end in foreclosure at an extraordinary rate. *Id.* ¶¶ 11–12. This startling failure rate is no secret to LOS; LOS updates the Colony Ridge Defendants with weekly spreadsheets of lots up for sale, which include many properties that had been previously sold, foreclosed on, and flipped. *See, e.g.*, *id.* ¶¶ 112, 135.

Moreover, Defendants' targeting of their predatory loan product at Hispanic consumers is readily apparent: Defendants' marketing campaign occurs almost exclusively in Spanish—starting with their alias, "Terrenos Houston"—on publicly-accessible websites and social media platforms, using cultural markers associated with Latin America like the national flags of various Latin American countries displayed in the building where LOS's Managing Member maintains an office. *Id.* ¶¶ 3, 34–47. That a disproportionate number of lot purchases involved at least one Hispanic consumer is evident to LOS, given that LOS processes every application for financing

as it reviews and signs the origination documents for every loan extended by Colony Ridge. *Id.* ¶¶ 10, 11, 65, 109.

## IV. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss, the complaint's well-pleaded factual allegations are accepted as true and construed in the light most favorable to the plaintiff. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). The Court must deny a motion to dismiss when the complaint's factual allegations, taken as true, state a "plausible" claim for relief. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 570. To prove "plausibility," a plaintiff need not prove "probability"—only "more than a sheer possibility that defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556, 570). Courts may make reasonable inferences from alleged facts to meet the plausibility standard. *Id.*

## V. Argument

LOS's motion raises four broad categories of arguments challenging the sufficiency of the Complaint, all of which must fail for the reasons discussed below.

*First*, Plaintiffs have stated plausible discrimination claims under ECOA and the FHA against LOS, and the Bureau has sufficiently alleged that LOS violated the CFPA by virtue of having violated ECOA.

*Second*, Plaintiffs have plausibly alleged that LOS is a "creditor" within the meaning of ECOA.

*Third*, LOS's argument that the ECOA and CFPA claims against it (Counts I and X) cannot proceed because Regulation B's definition of "creditor" is invalid fails because the Complaint plausibly alleges that LOS is a "creditor" under ECOA's *statutory* definition. Thus, the Court need not rely on the definition of "creditor" in Regulation B to allow the ECOA and CFPA claims to proceed. Even if the Court were to do so, Regulation B's definition of "creditor" fits squarely within ECOA's definition of "creditor." To the extent LOS seeks vacatur of

Regulation B based on the Bureau's funding mechanism, this Court should defer decision on this issue until the Supreme Court resolves the funding issue later this term.

*Fourth*, the Court should reject LOS's sweeping assertion that it is "not subject to" the FHA, ECF 49 at 15, which ignores the statute's plain language and relevant case law.

**A. The Complaint plausibly alleges that LOS can be held liable under ECOA, the FHA, and the CFPA for its role in the discriminatory targeting scheme.**

**1. Applicable Legal Standard.**

ECOA expressly prohibits discrimination by creditors in any aspect of a credit transaction based on an applicant's race, national origin, and other prohibited characteristics. 15 U.S.C. § 1691(a)(1). To state a claim for relief under ECOA, a plaintiff must plausibly allege that a creditor "discriminated against the plaintiff with respect to any aspect of a credit transaction on the basis of the plaintiff's membership in a protected class." *Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 705 (5th Cir. 2017); *see* 15 U.S.C. § 1691e(a) (establishing private right of action for "applicants" under ECOA); *see also* 1691e(h); 12 U.S.C. §§ 5564(a), 5481(12), (14) (together establishing Bureau and United States' authority to enforce ECOA). To allege a plausible claim for relief under the FHA, "it is enough to show that race [or other protected characteristic] was a consideration and played some role in a real estate transaction." *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (analyzing section 3604(a) claim); *see Ford v. Am. Homes for Rent*, No. 4:20-CV-63, 2020 WL 9950831, at *5 (S.D. Tex. June 8, 2020) ("[Plaintiff] only needed to plead that 'race was a consideration and played some role in a real estate transaction[.]'" (quoting *Hanson*, 800 F.2d at 1386)) (analyzing section 3604(a) claim); *Jones v. Caliber Home Loans, Inc.*, No. CV 18-1023-SDD-EWD, 2019 WL 3366104, at *4 (M.D. La. July 25, 2019) (analyzing sections 3604(a)-(b), 3605(a) claims).

In discriminatory targeting cases, plaintiffs may allege discrimination by showing that a defendant: (1) engaged in unfair or predatory lending practices; and (2) either intentionally targeted, or caused a disparate impact, on the basis of race, national origin, or another prohibited

basis.[2] *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000), on reconsideration in part, 147 F. Supp. 2d 1 (D.D.C. 2001) (partial reconsideration granted in non-relevant part) (ECOA and FHA claims under sections 3604(a), 3604(b), and 3605(a)); *see also Steed v. EverHome Mortg.Co.*, 308 F. App'x. 364, 368 (11th Cir. 2009) (FHA) (citing *Hargraves* with approval); *Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 357 (D. Md. 2022) (ECOA); *United States ex rel. Cooper v. Auto Fare, Inc.*, No. 3:14-CV-0008-RJC, 2014 WL 2889993, at *3 (W.D.N.C. June 25, 2014) (ECOA).

Importantly, Plaintiffs "need not plead a prima facie case of discrimination" to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see also Twombly*, 550 U.S. at 569–70 (affirming continued vitality of *Swierkiewicz*); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766–67 (5th Cir. 2019) (district court errs by "inappropriately heighten[ing] the standard" when "requiring a showing of each prong of the prima facie test" or "more than the ultimate elements of a claim" at pleading stage) (cleaned up). Instead, the only issue before a district court is "whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz*, 534 U.S. at 511.

Plaintiffs meet their burden at this stage under ECOA or the FHA by pleading sufficient facts to plausibly allege that LOS enables, gives force to, or participates in a course of conduct that it knows, or should know, is discriminatory. "[K]nowledge may be pled generally," and a plaintiff meets this standard by "plead[ing] facts making it more than a sheer possibility that [the defendant] acted with knowledge." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 261 (5th Cir. 2014) (reversing district court's dismissal of United States' claims where court "focus[e]d on facts the United States did not plead rather than inferences that the pleaded facts supported"). Courts have thus imputed liability where, for instance, a defendant's "representatives … were present at a site assessment… which 'revealed'" an ECOA violation. *See Beard v. Dominion Homes Fin. Servs., Inc.*, No. 2:06CV00137, 2007 WL 2137944 (S.D.

---

[2] Plaintiffs allege "targeting" throughout the Complaint. *E.g.*, ECF 1 at 1, 8; ¶¶ 10, 188, 193. They are not obligated to also plead disparate impact at the pleading stage.

Ohio July 23, 2007). LOS's contention that its liability must be analyzed in a vacuum, without reference to the Colony Ridge Defendants' related actions, is therefore mistaken.

For example, in *Mhany Management, Inc. v. County of Nassau*, a village had supported the construction of multi-family housing but reversed course after residents mounted an opposition campaign seemingly based on race. 819 F.3d 581, 589–597 (2d Cir. 2016). Though there was no evidence the village had race-based preferences, it was held liable under the FHA because it "acted with knowledge of [its] constituents' discriminatory animus." *Id.* at 612. Likewise, in *Taylor v. Accredited Home Lenders, Inc*., a home mortgage lender maintained a discretionary pricing policy that allowed brokers to increase interest on loans. 580 F. Supp. 2d 1062 (S.D. Cal. 2008). The court denied the motion to dismiss, in part because plaintiff sufficiently alleged that the "[d]efendant knew or had reasonable notice of the discriminatory impact of the brokers' application of the subjective component of [d]efendants' discretionary pricing policy" by alleging the existence of public government actions against other lenders involving similar discretionary pricing policies. The court found the defendants could therefore be held liable for the brokers' discriminatory policies under ECOA and the FHA. *Id.*; *see also Connolly v. Lanham*, No. CV SAG-22-02048, 2023 WL 4932870, at *6 (D. Md. Aug. 2, 2023) (denying motion to dismiss FHA claim where creditor relied on discriminatory appraisal when it "was aware of the discriminatory appraisal, had the power to order a second appraisal or conduct a formal appeal and review, and failed to take action to remedy the discrimination"); *Munoz v. Int'l Home Cap. Corp.*, No. C 03-01099 RS, 2004 WL 3086907, at *3 (N.D. Cal. May 4, 2004) (denying motion to dismiss FHA claims against individual defendants where the complaint alleged they "took part in the sale of the properties and/or the brokering of the loans at issue").

This analysis of liability for an entity that participates in a course of conduct that it knows or should know is discriminatory is also consistent with the implementing regulations for ECOA and the FHA. As is relevant here, an entity is directly liable under the FHA for "its own conduct that results in a discriminatory housing practice," and for "failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should

have known of the discriminatory conduct and had the power to correct it." 24 C.F.R.§ 100.7(a)(1)(i), (iii). Likewise, Regulation B permits one entity to become a "creditor regarding any violation of the Act or this regulation committed by another creditor," where the first entity "knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved . . . ." 12 C.F.R. § 1002.2(l).

As detailed below, the Complaint plausibly alleges that LOS enabled, gave force to, and participated in the discriminatory targeting scheme, and therefore may be held liable.

**2. The Complaint plausibly alleges LOS's conduct violated ECOA and the FHA.**

Contrary to LOS's arguments, the Complaint pleads more than sufficient facts to make out a violation of ECOA and the FHA (and the CFPA based on the violation of ECOA) against LOS for directly enabling, giving force to, and participating in a scheme to discriminate against Hispanic consumers. LOS spills much ink pondering allegations the Complaint *could have* made against it, ECF 49 at 3–6, and, in doing so, ignores the key allegations the Complaint *does* make, as well as the reasonable inferences that can be drawn therefrom. *See Bollinger Shipyards*, 775 F.3d at 261 (reversing district court's dismissal of United States' claims where court "focus[e]d on facts the United States did not plead rather than inferences that the pleaded facts supported" and viewed facts in light most favorable to defendant).

The Complaint alleges LOS is an active participant in Defendants' scheme and provides crucial contributions to the extension of the predatory and discriminatory credit at issue here. Specifically, the Complaint alleges that LOS: (1) plays a key role in originating the loans; (2) reviews and signs off on significant transactional documents such as consumers' applications for financing; (3) provides essential support and consumer-facing documents and disclosures; and (4) regularly supplies key lending and sales data to Colony Ridge. ECF 1 ¶¶ 31, 110, 112, 113. Importantly, LOS contributes to the predatory nature of the loan product in essential ways, including by signing off on consumers' applications for financing with complete disregard for consumers' ability to repay, and supplying English-only disclosures that fail to apprise

consumers of the true nature of their loans. ECF 1 ¶¶ 90, 113–16, 118. *See, e.g.*, *Munoz*, 2004 WL 3086907, at *2 (loans that exceeded what plaintiffs could pay and failure to translate key transaction documents from English to Spanish rendered loans predatory). To give credence to LOS's argument that its role in the above actions was merely "ministerial" would require the Court to draw inferences in LOS's favor, rather than Plaintiffs', in contravention of well-established pleadings standards. ECF 49 at 2.

Any suggestion that LOS somehow could not have known about a systematically discriminatory course of conduct in which it participated by originating tens of thousands of loans since at least 2016 is simply implausible. Indeed, LOS's Managing Member maintained an office in the Terrenos Houston office for years, ECF 1 ¶ 111, the same location where the Complaint alleges the Colony Ridge Defendants lured tens of thousands of Hispanic consumers for predatory loans and prominently displayed Hispanic cultural markers, such as regional music and the national flags of Latin American countries. *Id.* ¶¶ 3, 70, 83. In that time, LOS originated tens of thousands of loans, reviewed and signed off on key lending documents, prepared corresponding disclosures and transactional paperwork for consumers, and was paid handsomely for its efforts. *Id.* ¶¶ 10, 110, 113–16. LOS cannot now escape the fact that it made itself essential to Defendants' seller-financing scheme. Altogether, this alleged conduct is amply sufficient to state a plausible claim that LOS's conduct violates ECOA and the FHA.

**B. Plaintiffs plausibly allege that LOS is a creditor under ECOA.**

Having collected millions of dollars since first agreeing to originate each and every seller-financed mortgage to purchase lots in the Terrenos Houston Subdivisions, LOS now attempts to distance itself from the predatory seller financing at issue by downplaying its role as "ministerial," and contending that it is not a creditor within the meaning of ECOA. ECF 49 at 2, 17. The well-pleaded allegations of the Complaint make plain, however, that LOS fits squarely within the statutory definition.

ECOA defines a "creditor" to include any person who regularly extends, renews, or continues credit, or who regularly arranges for the extension, renewal, or continuation of credit;

or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit. 15 U.S.C. § 1691a(e). LOS is a creditor because it extends (or arranges to extend) the predatory seller financing at issue here by originating it at the outset. Indeed, there is a reason why Colony Ridge has paid more than $2 million in fees to LOS over the last five years. Without LOS's licensed mortgage originators, and its delivery, review, and signing of these disclosures and documents, the Colony Ridge Defendants would not be able to offer their seller financing to consumers. ECF 1 ¶¶ 31, 113–14. These facts plausibly allege LOS extends credit—or arranges to extend credit—in every transaction financing a purchase in the Terrenos Houston Subdivisions, making LOS a creditor under ECOA.

LOS attempts to reframe its role as "ministerial," but its own status as a state-licensed originator belies that posturing. *Id.* ¶ 31. The Texas Secure and Fair Enforcement for Mortgage Licensing (SAFE) Act, which governs licensure of mortgage originators, actually distinguishes entities whose roles are solely administrative or clerical from those entities licensed to participate in credit transactions, like LOS. Tex. Fin. Code § 180.002(19); *see also* Tex. Admin. Code § 81.2(11), (16) (defining minimum conduct that renders a person a "residential mortgage loan originator" under the statute). Notably, the definition of a residential mortgage loan originator subject to Texas state licensure excludes those who "perform[] solely administrative or clerical tasks" and distinguishes them from "loan processors" who "perform[] clerical or support duties." Tex. Fin. Code § 180.002(19).

That the Colony Ridge Defendants are *also* involved in making loans to consumers does not absolve LOS from liability under ECOA for its own substantial role in extending the credit, as it is well-settled that more than one entity may be a "creditor" in any given credit transaction. *See, e.g.*, *United States v. Home Loan Auditors, LLC*, No. 16-CV-04839-RS, 2016 WL 6962881 (N.D. Cal. Nov. 29, 2016) (conduct rendered home loan audit company a creditor under ECOA even though separate creditor modified the loans at issue); *Whitley v. Taylor Bean & Whitacker Mortg. Corp.*, 607 F. Supp. 2d 885 (N.D. Ill. 2009) (conduct rendered mortgage broker a creditor under ECOA even though separate mortgage company was lender on transactions at issue);

*Council v. Better Homes Depot, Inc.*, No. 04 CV 5620 NGG KAM, 2006 WL 2376381 (E.D.N.Y. Aug. 16, 2006), *adhered to on denial of reconsideration*, No. 04 CV 5620 NGGKAM, 2007 WL 680768 (E.D.N.Y. Mar. 2, 2007) (allowing ECOA discriminatory targeting claim to go forward against both corporate house flipper and lender that originated the credit at issue).

LOS's suggestion that it cannot be regarded as a creditor because it does not directly engage with consumers on a one-on-one basis in most transactions, ECF 49 at 11, is similarly unavailing. Notwithstanding LOS's extensive role in preparing, requesting, reviewing, processing, and signing key transactional documents, as well as compiling and reviewing information regarding each mortgage transaction, ECF 1 ¶¶ 112–17, nothing in ECOA requires the direct-to-consumer, one-on-one interaction that LOS argues is necessary to hold a defendant liable as a creditor. The case law likewise does not support LOS's position. *See Ford v. Cenance*, 452 U.S. 155, 156–58 (1981) (holding that entity which "did not assist in the actual negotiations" with the applicant was nonetheless a "creditor" under substantially similar definition of "creditor" in the Truth in Lending Act, as the definition "easily encompasse[d] both the dealers and [Ford Motor Credit]," and that one "*arranged* for the extension of credit" while the other "actually *extended* the credit.").

Recognizing LOS's role as a "creditor" under ECOA is also consistent with other case law reaffirming that ECOA's definition of "creditor" encompasses a broad range of roles in credit transactions, including where the creditor's role is far more attenuated than it is here. *See, e.g.*, *Home Loan Auditors, LLC*, 2016 WL 6962881, at *3 (allowing ECOA discriminatory targeting claim to go forward against sales representative of company that targeted Hispanic consumers with costly home loan audits, under false promise that audits were necessary to arrange for favorable loan modifications on consumers' behalf); *Whitley*, 607 F. Supp. 2d at 902 (N.D. Ill. 2009) (mortgage brokers "arrange for the extension of credit and thus fall under the purview of [ECOA]"); *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827, 834 n.9 (allowing ECOA discrimination claims to proceed against mortgage broker alleged to have targeted Hispanic consumers with higher interest rates than they qualified for).

In sum, the Complaint's allegations are more than sufficient to plausibly establish that LOS is a creditor under ECOA.[3]

**C. Regulation B provides no basis to dismiss any claims brought against LOS.**

Finally, the Court should reject LOS's effort to evade liability for its conduct by attacking the validity of Regulation B's definition of "creditor." ECF 49 at 12–14.

As explained above, the Complaint plausibly alleges that LOS is a "creditor" under the *statutory* definition of that term. Because the Court need not rely on the regulatory definition to allow the ECOA and CFPA claims to proceed, LOS's challenge to that definition is irrelevant, and the Court can and should end its inquiry here.

But even if LOS's challenge to Regulation B's definition *were* relevant here, LOS's challenges to that definition would still lack merit.[4] Contrary to LOS's claim, Regulation B's definition of "creditor" fits well within ECOA's definition of that term. Under Regulation B, a creditor includes, as alleged here, "a person who, in the ordinary course of business, regularly participates in a credit decision . . . [or who regularly] refers applicants or prospective applicants to creditors." 12 C.F.R. §1002.2(l); 44 Fed. Reg. 23,813 (April 23, 1979). The question, then, is whether ECOA covers persons who regularly participate in credit decisions. It clearly does.

The text of the statute covers not only those who extend credit, but also those who "regularly arrange[] for the extension of credit." 15 U.S.C. § 1691a(e). A person who "regularly participates in the decision of extending credit" fits neatly within that definition. *See* ECF 1 ¶ 159; *see also Calderone v. Sonic Houston JLR, L.P.*, 879 F.3d 577, 579 n.1 (5th Cir. 2018) (noting ECOA could cover those "who provide customer credit applications to lenders"). Nor does anything in ECOA suggest otherwise, entitling the Bureau to deference in its reasonable interpretation of what it means to "extend" or "arrange for extension of credit." Indeed, LOS's

---

[3] Because LOS easily meets the definition of a "creditor" under the first clause of the definition, the Court need not determine whether LOS is also a creditor by virtue of being an assignee. ECF 49 at 12, 13 n.6.

[4] Even if the Court thought that Regulation B's definition of "creditor" were somehow invalid, that would not justify vacatur of the provision on a motion to dismiss. *Contra* ECF 49 at 12.

argument consists entirely of invoking irrelevant caselaw about a different provision of the regulation. ECF 49 at 14. LOS's reference to case law on whether the definition of "applicants" includes "guarantors" or "prospective applicants" is simply beside the point here, especially given that LOS does not dispute whether the aggrieved consumers are "applicants" within the meaning of ECOA or Regulation B. *See* ECF 49 at 2, 11–12.

Finally, the Court should decline LOS's invitation to vacate Regulation B "because the CFPB could not have promulgated it without its 'unconstitutional funding,'" ECF 49 at 12, in reliance on the Fifth Circuit's decision in *Community Financial Services Association of America, Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) (*CFSA*). While the Bureau disagrees with the Fifth Circuit's holding in *CFSA* for the reasons advanced by the Solicitor General in the Supreme Court, *see* Br. of Pet., *CFSA*, 2023 WL 3385418, the Court need not address the issue now, both because it is unnecessary for resolving LOS's motion to dismiss, and because the Supreme Court is expected to issue a decision on the Bureau's appeal of that ruling by the end of June 2024, which this Court may then simply apply. *See CFPB v. CFSA*, No. 22-448 (U.S.).

For each of these reasons, the Court should reject LOS's facial attack on Regulation B.

**D. The Complaint plausibly alleges that LOS is subject to the FHA.**

Contrary to LOS's assertions that it is "not subject to" the FHA and that the United States has alleged "no facts" to support its FHA claims against LOS, ECF 49 at 15, the Complaint alleges sufficient facts to state plausible claims against LOS for its direct participation in, and contributions to, Defendants' systematic discrimination against Hispanic consumers, consistent with the language of the FHA and interpretive caselaw.

**1. The United States plausibly alleges that section 3604 of the FHA applies.**

In relevant part, section 3604(a) states: "it shall be unlawful" to "otherwise make unavailable or deny, a dwelling to any person because of race . . . or national origin." 42 U.S.C. § 3604(a). Section 3604(b), in turn, states: "it shall be unlawful" to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of

services or facilities in connection therewith, because of race . . . or national origin." 42 U.S.C. § 3604(b).

"The provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction[.]" *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982) (threats to evict white tenants for hosting black guests violated section 3604(b)). Notably, section 3604 does not limit its application to a certain class of defendants. Instead, "[b]y drafting the FHA in the passive voice, Congress 'bann[ed] an outcome while not saying who the actor is.'" *Conn. Fair Hous. Ctr. v. Corelogic Rental Prop. Sols., LLC*, 369 F. Supp. 3d 362, 370 (D. Conn. 2019) (quoting *NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992)); *accord Meyer v. Holley*, 537 U.S. 280, 285 (2003) (noting that FHA "focuses on prohibited acts"). Accordingly, the question is not whether LOS is an entity "subject to" section 3604, but rather whether the United States has pled adequate facts to show that LOS made dwellings unavailable because of race or national origin under section 3604(a), or discriminated in the terms, conditions, or privileges of the sale of a dwelling or in the provision of services or facilities in connection therewith under section 3604(b).

The United States has done so here by alleging, in detail, how LOS directly participated in Defendants' discriminatory targeting of Hispanic consumers for predatory loans. *See* section V.A.2, *supra*; *see also Hargraves*, 140 F. Supp. 2d at 20 (predatory lending "can make housing unavailable by putting borrowers at risk of losing the property which secures their loans" under section 3604; denying defendants' motion for summary judgment on plaintiffs' section 3604(a) and 3604(b) claims, with the exception of a single plaintiff's abandoned section 3604 claim regarding a home equity loan); *Barkley v. Olympia Mortg. Co.*, No. 04 CV 875, 2007 WL 2437810, at *13–15 (E.D.N.Y. Aug. 22, 2007) (denying motion to dismiss plaintiffs' claim of discriminatory targeting of minorities for unfair loans on defective homes under section 3604(b)).

LOS's arguments to the contrary are unavailing. As an initial matter, LOS's contention that it was not "in the business of[] selling or renting dwellings," ECF 49 at 15, is irrelevant. *See*

*Evans v. Tubbe*, 657 F.2d 661, 663 n.3 (5th Cir. 1981) ("Section 3604(a) is not limited to discriminatory practices by actual lessors and vendors of dwellings."); *Ga. State Conf. of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627, 635 (11th Cir. 2019) ("[The text of § 3604(b) does not limit its applicability [to housing providers] and our case law has never held that only housing providers are subject to liability thereunder.").

Moreover, while LOS complains the United States has not alleged that LOS "funded any loans, made any credit decisions, or participated in any of Colony Ridge's marketing strategy" or set the terms of the loans, ECF 49 at 15–16, LOS ignores that the United States has alleged LOS played a key role in originating the seller financing, provided essential support and consumer-facing documents and disclosures, and regularly supplied key lending and sales data to the Colony Ridge Defendants. ECF 1 ¶¶ 7, 31, 110, 116. Indeed, a third-party service provider that participates in the provision of services or facilities in connection with the sale of a dwelling can, likewise, be held liable for its role, regardless of whether it has direct contact with consumers. *Ga. State Conf.*, 940 F.3d at 635 (rejecting city's argument that it could not be liable under section 3604(b) because it was a "third-party provider of services and 'a stranger to each individual plaintiff's sale or rental of the property'"). Taken together, and drawing all reasonable inferences in favor of the United States, the Complaint has stated plausible claims for relief under section 3604(a)-(b).

**2. The United States plausibly alleges that section 3605(a) of the FHA applies.**

Section 3605(a) provides: "It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race . . . or national origin." 42 U.S.C. § 3605(a). "Residential real-estate transaction" means, as is relevant here, "[t]he making or purchasing of loans or providing other financial assistance . . . for purchasing, constructing, improving, repairing, or maintaining a dwelling." *Id.* § 3604(b)(1)(A).

The threshold for pleading that a defendant is an "entity whose business includes engaging in residential real-estate transactions" is not onerous. "The plain language of § 3605 merely requires that the entity conduct business which '*includes* engaging in residential real estate-related transactions.'" *Eva v. Midwest Nat'l Mortg. Bank, Inc.*, 143 F. Supp. 2d 862, 889 (N.D. Ohio 2001) (quoting 42 U.S.C. § 3605(a)) (residential real-estate transactions "need only be 'included' as one portion of [entity's] overall functioning"). As observed by one court, it is "obvious that the FHA precludes discrimination in the origination of loans." *Fulton Cnty., Ga. v. Wells Fargo & Co.*, No. 1:21-CV-1800, 2022 WL 846903, at *6 (N.D. Ga. Mar. 22, 2022).

The Complaint adequately alleges that LOS's "business includes engaging in residential real-estate transactions," both by virtue of its licensure with the state as a residential mortgage loan originator, ECF 1 ¶ 31, and its specific conduct alleged with respect to the loans made for the Terrenos Houston Subdivisions. As a residential mortgage loan originator in Texas, LOS, "for compensation or gain or in the expectation of compensation or gain," "takes a residential mortgage loan application" or "offers or negotiates the terms of a residential mortgage loan." Tex. Fin. Code § 180.002(19). As such, LOS's "business includes engaging in residential real-estate transactions" because the taking of residential mortgage loan applications and offering or negotiating the terms of a residential mortgage loan are integral to the "making . . . of loans." 42 U.S.C. § 3605(a)–(b). With respect to its involvement in Defendants' scheme, the Complaint alleges that LOS plays a key role in the lending process by originating the loans, providing essential support and consumer-facing documents and disclosures, and regularly supplying key lending and sales data to the Colony Ridge Defendants. ECF 1 ¶¶ 7, 31, 90, 91, 93, 110–16. While LOS contests its liability under section 3605(a) on the grounds that LOS is not a lender, ECF at 16, "[t]he plain language of the statute does not . . . require a defendant to be a mortgage lender, banker, mortgage arranger or creditor." *Eva*, 143 F. Supp. 2d at 889 (interpreting section 3605(b)).

For all of these reasons, the Complaint plausibly alleges that LOS has engaged in conduct that violates section 3605(a) of the FHA.

### E. Should the Court grant the Motion to Dismiss, it should do so without prejudice, and grant Plaintiffs leave to amend.

Should the Court ultimately grant LOS's motion to dismiss for failing to state a claim, it should dismiss the Complaint without prejudice and grant Plaintiffs an opportunity to amend their pleading to add any additional factual support the Court deems necessary to withstand a Rule 12(b)(6) motion. *See Tex. Indigenous Council v. Simpkins*, 544 F. App'x 418, 421–22 (5th Cir. 2013) ("Permission [to amend] should be denied only if it appears to a certainty that plaintiffs cannot state a claim showing they are entitled to relief or defendant will be unduly prejudiced.") (citing *Hildebrand v. Honeywell, Inc.*, 622 F.2d 179, 182 (5th Cir. 1980)). Indeed, LOS provides no support for its suggestion that no additional facts might be pled to further establish LOS's role and legal culpability in Defendants' illegal predatory lending and targeting scheme. Accordingly, dismissal without leave to amend would be unwarranted.

DATED: March 12, 2024

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CARRIE PAGNUCCO
Chief

VARDA HUSSAIN
Principal Deputy Chief

s/ *Melissa A. Carrington*
MELISSA A. CARRINGTON
Attorney-in-Charge *(pro hac vice)*
IA Bar No. 13033

TERRENCE K. MANGAN, JR. *(pro hac vice)*
MD Bar No. 2006010006

JIMMY S. MCBIRNEY *(pro hac vice)*
NY Bar No. 4798799

HANNAH C. ABELOW *(pro hac vice)*
NY Bar No. 5931464

Trial Attorneys

Respectfully submitted,

ERIC HALPERIN
Enforcement Director

DEBORAH MORRIS
Deputy Enforcement Director

REBECCAH BOWER
Assistant Litigation Deputy

s/ *E. Vanessa Assae-Bille*
E. VANESSA ASSAE-BILLE
Attorney-in-Charge *(pro hac vice)*
NY Bar No. 5165501

ALEXIS C. CHRISTENSEN *(pro hac vice)*
DC Bar No. 1723838

ANDREA M. LOWE *(pro hac vice)*
DC Bar No. 187250

Office of Enforcement
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
150 M Street, NE
Washington, DC 20530
Tel: (202) 514-4713
Fax: (202) 514-1116
Email: melissa.carrington2@usdoj.gov
terrence.mangan2@usdoj.gov
jimmy.s.mcbirney2@usdoj.gov
hannah.abelow@usdoj.gov

ALAMDAR S. HAMDANI
United States Attorney

DANIEL DAVID HU
Civil Division
Chief

*s/ Elizabeth F. Karpati*
ELIZABETH F. KARPATI
SDTX: 20567
TX Bar No. 00794069

Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, TX 77002
Tel: (713) 567-9767
Fax: (713) 718-3303
Email: elizabeth.karpati@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*

Tel: (202) 435-7000
Fax: (202) 435-7722
Email: elisabeth.assae-bille@cfpb.gov
alexis.christensen@cfpb.gov
andrea.lowe@cfpb.gov

*Attorneys for Plaintiff*
*Consumer Financial Protection Bureau*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2024, a copy of the foregoing PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO LOAN ORIGINATOR SERVICES, LLC'S MOTION TO DISMISS was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

s/ *E. Vanessa Assae-Bille*
E. VANESSA ASSAE-BILLE
1700 G Street, NW
Washington, DC 20552
Tel: (202) 435-7000
Fax: (202) 435-7722
Email: elisabeth.assae-bille@cfpb.gov