# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-4729 |
| | ) | Hon. Judge Alfred H. Bennett |
| COLONY RIDGE DEVELOPMENT, LLC, | ) | |
| d/b/a Terrenos Houston, Terrenos Santa Fe, | ) | |
| and Lotes y Ranchos; | ) | |
| | ) | |
| COLONY RIDGE BV, LLC; and | ) | |
| | ) | |
| COLONY RIDGE LAND, LLC, formerly | ) | |
| d/b/a Terrenos Houston and Lotes y Ranchos, | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF AMICI CURIAE NATIONAL FAIR HOUSING ALLIANCE, NATIONAL CONSUMER LAW CENTER, UNIDOSUS, PUBLIC JUSTICE, CENTER FOR RESPONSIBLE LENDING, POVERTY AND RACE RESEARCH ACTION COUNCIL, SOUTHERN POVERTY LAW CENTER, AND LEAGUE OF UNITED LATIN AMERICAN CITIZENS IN OPPOSITION TO JOINT MOTION

Yiyang Wu
Nicholas Abbott
Relman Colfax PLLC
1225 19th Street, NW, Suite 600
Washington, D.C. 20036
(202) 728-1888

Elena Goldstein
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 488-9090

Janell M. Byrd
Sasha Samberg-Champion
National Fair Housing Alliance
1331 Pennsylvania Avenue NW, Suite 650
Washington, DC 20004
(202) 898-1661

*Attorneys for Amici Curiae*                    March 3, 2026

## INTEREST OF AMICI CURIAE

Amici are eight nonprofit organizations dedicated to fair housing and civil rights: National Fair Housing Alliance, National Consumer Law Center, UnidosUS, Public Justice, Center for Responsible Lending, Poverty and Race Research Action Council, Southern Poverty Law Center, and League of United Latin American Citizens. Amici submit this memorandum because they are concerned that the parties' joint motion improperly asks the Court to approve and enforce relief that is unrelated to the pleaded case or the civil rights statutes under which it was brought, even as the proposed settlement fails to provide adequate relief to those harmed by the predatory and discriminatory scheme at issue. Approving the joint motion thereby would undermine civil rights enforcement and is contrary to the requirement that a "consent decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction." *Local Number 93, International Assoc. of Firefighters v. Cleveland,* 478 U.S. 501, 525 (1986). Given the lack of adversarial argument on the parties' joint motion, Amici believe that this memorandum will be helpful to the Court in considering the motion.

## INTRODUCTION

As the Court is well aware, this case is primarily about predatory loan products targeted at Hispanic consumers in the Houston area. Among other relief, the complaint sought damages for the consumers defrauded by Defendants' scheme. Plaintiff the United States of America and Defendants Colony Ridge Development, LLC, Colony Ridge BV, LLC, and Colony Ridge Land, LLC ("Defendants" and, collectively, "Parties") now propose a settlement agreement that fails to provide any meaningful relief for those defrauded, while instead including terms that have nothing to do with this case—including a requirement that Colony Ridge funnel $20 million toward increased immigration enforcement in the communities where many of those consumers reside. In other words, instead of providing individual relief to the victims of Defendants' predatory scheme,

the settlement agreement appears intended to subject them to heightened surveillance, and, for some, could subject them to potential detention, family separation, or even deportation.

The motion filed under Federal Rule of Civil Procedure 41(a)(2) ("the Motion") asks this Court to issue an order dismissing this action with prejudice and retaining the Court's jurisdiction over the parties to enforce the terms of their settlement agreement. Under well-settled law, granting this Motion would give judicial imprimatur to the agreement's terms. In asking the Court to retain jurisdiction to enforce the settlement agreement, the Parties effectively ask the Court to enter a consent decree. To do so, the Court must independently consider whether the agreement is based on the pleaded case, furthers the purposes of the applicable statutes, and negatively affects third parties. These factors overwhelmingly favor denial of the Motion.[1]

**BACKGROUND**

I.    **The Complaint Alleges a Predatory, Discriminatory Scheme by Defendants to Sell Lots Using Seller-Financed Mortgages to Hispanic Consumers.**

Colony Ridge is a collection of six subdivisions, spanning over 40,000 lots, in Liberty County, Texas, located 40 miles northeast of Houston. Defendants marketed the lots and offered seller-financed mortgages to finance the sale of those lots. Doc. #1 ¶ 2.

Defendants' mortgages were predatory. As the Court explained in its decision denying Defendants' motion to dismiss, the Fair Housing Act ("FHA") and the Equal Credit Opportunity Act ("ECOA") bar reverse redlining, which is the "intentional[] target[ing of] specific racial or ethnic groups with predatory financing." *Consumer Fin. Prot. Bureau v. Colony Ridge Dev., LLC*,

---

[1] This brief takes no position on the relationship between the Agreement and the claims brought in the parallel case brought by the State of Texas. *State of Texas v. Colony Ridge, Inc., et al.*, No. 4:24-cv-941 (S.D. Tex.). The Parties have chosen to formulate the Agreement as a settlement of the claims at issue here and in that case, even though they did not seek to consolidate or otherwise designate the cases as related. Even if the Agreement's relief were related to the claims brought by the State of Texas, this Court cannot address them here because this Court's jurisdiction is premised solely on the pleaded case brought by the Government.

No. 4:23-CV-04729, 2024 WL 5183711, at *4 (S.D. Tex. Sept. 13, 2024). Since that decision, the Second Circuit has ruled similarly and affirmed the key features of a predatory loan product in the context of reverse redlining claims: "imposing 'exorbitant interest rates, lending based on the value of the asset securing the loan rather than a borrower's ability to repay[], repeated foreclosures, and loan servicing procedures in which excessive fees are charged.'" *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 139 (2d Cir. 2025) (quoting *Hargraves v. Cap. City Mortg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000)), *cert. denied,* No. 25-229, 2026 WL 79895 (U.S. Jan. 12, 2026). Defendants' seller-financed mortgages bear many of these hallmarks of a predatory loan product, indicating that the "loans' terms are grossly unfavorable." *Colony Ridge*, 2024 WL 5183711, at *5.

First, the interest rates were exorbitant. Interest rates for these mortgages were fixed at 10.9, 11.9, or 12.9 percent—three-to-five times prevailing rates. *Id.* ¶¶ 72–73. Second, these rates were not based on any individualized assessment of buyers' ability to pay. *Id.* ¶ 74. Indeed, Defendants did not request or collect any documentation regarding consumers' income or assets, *id.* ¶¶ 80–81, 88–89, 115–16, underscoring Defendants' indifference regarding buyers' ability to pay. Third, Defendants initiated foreclosures in at least 30 percent of seller-financed lots within three years of the customer's purchase date, resulting in a monthly average of 298 foreclosures initiated between January 2022 and June 2023. *Id.* ¶¶ 11–12. Indeed, Defendants were responsible for 92 percent of all foreclosures between 2017 and 2022 in Liberty County, which consequently saw more foreclosures than Dallas County or Bexar County in 2021 and 2022 despite a population 20 times smaller than those counties. *Id.* ¶ 12. Fourth, Defendants assessed late fees on delinquent borrowers, compounding borrowers' inability to repay their loans. *Id.* ¶ 14.

Moreover, these loans were predatory because Defendants materially misrepresented their terms. Defendants misrepresented the infrastructure available at lots for sale by (1) falsely stating

that they were equipped with infrastructure to connect to utilities, (2) omitting the total cost to install and connect necessary infrastructure, and (3) misrepresenting flooding risk and the large expenses required to mitigate that risk. *Id.* ¶¶ 4, 48–55, 118–126. The underlying assets at issue therefore were substantially worse than advertised, exacerbating the predatory nature of the loans. And because of the undisclosed deficiencies in those lots, consumers had to expend substantial amounts remedying them, *id.* ¶ 126, often forcing them further into debt and further increasing the likelihood of default. Defendants also rushed Spanish-speaking buyers through reviewing and signing pre-closing and closing documents without providing the documents in Spanish, *id.* ¶¶ 83-109, leaving them uninformed about the terms of the loans they were entering into.

Defendants intentionally targeted these predatory loans at Hispanic consumers. Defendants marketed lots for sale through Tik Tok and Instagram almost exclusively in Spanish. *Id.* ¶¶ 34–35. For example, Defendants posted over 100 advertising videos in one month to a single TikTok account, @yosoyterrenoshouston, all of which were entirely in Spanish. *Id.* In addition, Defendants used multiple websites for marketing that defaulted to or were exclusively in Spanish. *Id.* ¶ 37. Defendants also employed Spanish-speaking salespeople, luring consumers with promises of camaraderie, cultural markers including flags of Latin American countries, and shared hopes of achieving the American Dream. *Id.* ¶¶ 40–46, 69. This targeted marketing achieved the desired result: 91 percent of transactions in Defendants' subdivisions involved at least one Hispanic consumer, even though the broader metropolitan area is only 38 percent Hispanic. *Id.* ¶ 10.

Defendants' discriminatory scheme caused severe harm to consumers. Many homebuyers struggled to repay the high-interest, seller-financed mortgages, resulting in defaults and foreclosures. *Id.* ¶¶ 127–35. As set forth above, Defendants initiated foreclosures in at least 30 percent of their seller-financed lots within three years of the customer's purchase date—almost 15

times the national average. *Id.* ¶ 11. Defendants' foreclosure strategy allowed them to collect down payments, fees, and mortgage payments from customers, foreclose on properties before consumers acquired much (if any) equity, and restart the cycle again. *Id.* ¶¶ 14–15. In one case, Defendants sold a property in May 2020, foreclosed and resold the property in December 2020, foreclosed and resold the property *again* in August 2021, and then foreclosed and put the property up for sale *for a fourth time* in August 2022. *Id.* ¶ 135. For just one property over two years, Defendants extracted thousands of dollars from consumers who ended up with nothing.

Beyond defaults and foreclosures, consumers suffered by paying interest rates significantly higher than prevailing rates at the time and unreasonable fees. *Id.* ¶¶ 14, 72–73. Furthermore, many households spent hundreds and sometimes thousands of dollars installing the infrastructure necessary to connect water, sewer, and electrical services, *id.* ¶ 126, after Defendants represented that the lots already were equipped with that infrastructure. Often, they lost this investment when they suffered foreclosure, as described above.

On December 20, 2023, in response to this discriminatory scheme, the United States of America and the Consumer Financial Protection Bureau ("CFPB" and, collectively, "the Government") sued Defendants (along with the now-dismissed Loan Originator Services, LLC) in this Court, bringing causes of action under the ECOA, the FHA, the Consumer Financial Protection Act of 2010 ("CPFA"), the Interstate Land Sales Full Disclosure Act ("ILSA"), and regulations enforcing those statutes. The suit asked the Court, among other relief, to "award consumers and aggrieved persons redress" and to "order the rescission or reformation of contracts obtained" through the discriminatory scheme. *Id.* at 43–44. The complaint did not encompass concerns about undocumented immigration or any harms purportedly caused by undocumented immigrants. Nor

did the complaint seek as a remedy any additional law enforcement in the subdivisions or make any reference whatsoever to law enforcement in those subdivisions.

## II.    The Court Substantially Denied Defendants' Motion to Dismiss, Finding That the Government Plausibly Pled Reverse Redlining and Violations of the ECOA and the FHA.

On February 20, 2024, Defendants moved to dismiss the complaint, arguing *inter alia* that (1) the Government's "reverse redlining" theory of discrimination was not cognizable; (2) the allegations did not meet the elements of a reverse redlining claim; (3) they were not creditors (and thus not covered by the ECOA); and (4) the lots at issue were not "dwellings" within the meaning of the FHA.

The Court denied Defendants' motion in substantial part, ruling against them on each of these key threshold legal issues.[2] First, the Court ruled that the FHA and the ECOA prohibit reverse redlining. *Colony Ridge Dev., LLC*, 2024 WL 5183711, at *4–5. Second, the Court recognized that Defendants' conduct, as alleged, satisfied the elements of a reverse redlining claim. *Id.* at *5. Third, the Court concluded that Defendants qualified as creditors based on the facts alleged. *Id.* at *5–6. And fourth, the Court held that the FHA applies to vacant lots in residential subdivisions marketed and sold by Defendants. *Id.* at *6.

The Court's order paved the way for a substantial settlement that would achieve the relief sought in the complaint and vindicate the interests of consumers victimized by Defendants. Instead, as set forth below, the Government proposes to forfeit the meritorious claims alleged in the complaint, let Defendants off the hook, and leave consumers without compensation for the harms they have suffered.

---

[2] In addition, the Court dismissed the Government's claims under 42 U.S.C. § 3604(a).

### III.    The Parties Agreed to Improper Settlement Terms Unrelated to this Case.

On February 10, 2026—following a change in Administration and the appointment of a new Assistant Attorney General for Civil Rights, Harmeet Dhillon—the Government announced it had reached a settlement agreement (the "Agreement") with Defendants. Dhillon herself announced the settlement. In a press release, Dhillon touted the settlement as a victory against "schemes which ultimately encourage illegal immigration." U.S. Dep't of Just., Civil Rights Division Secures $68M Settlement in Predatory Land Sales and Lending Lawsuit (Feb. 10, 2026), https://www.justice.gov/opa/pr/civil-rights-division-secures-68m-settlement-predatory-land-sales-and-lending-lawsuit.

Consistent with Dhillon's public statement, a major component of the Agreement (the "Immigration Enforcement Funding Clause" or "Clause") concerns immigration and law enforcement—not Defendants' discriminatory conduct and the harms caused by it. The Clause requires Defendants to expend $20 million "to increase law enforcement presence and effectiveness" within the Colony Ridge developments. The Clause provides that those funds are intended to support "additional delegated immigration enforcement authority from the federal government" in the subdivisions, construction of a law enforcement sub-station, financial support of two officers to patrol the development, and law enforcement equipment. Doc. #149-1 ¶ 26.

The Agreement also requires Defendants to set aside $48 million for infrastructure improvements. But because Defendants are not barred from increasing the sale prices of lots, the infrastructure investments primarily will benefit Defendants by increasing the value of lots they continue to sell, including those repossessed through foreclosure. Critically, those funds (or any of the terms of the Agreement, for that matter) do nothing for those who have lost their lots and financial investments to foreclosure. Given the Agreement's 10-year timeline for these repairs, the

predatory interest rates for Defendants' seller-financed mortgages, and Defendants' rate of foreclosure, many more consumers are likely to lose their lots before any improvements are made—allowing Defendants to foreclose on and resell those lots at a higher price. *See* Doc. #1 ¶¶ 14-15, 135.

Relevant to the instant Motion, the Agreement does not provide for *any financial redress whatsoever* for aggrieved persons or the rescission or reformation of contracts, as originally sought in the complaint. Those who lost thousands of dollars to this predatory scheme receive no relief. The Agreement does include requirements that Defendants develop and apply underwriting standards, a default avoidance plan, and a foreclosure policy, but these terms are not retrospective and would not help past victims of Defendants' scheme. *See* Doc. #149-1 ¶¶ 14–16, 18. Other provisions simply require that Defendants comply with the law, *e.g.*, *id.* ¶ 12, reiterating their existing legal obligations.

## ARGUMENT

On February 10, 2026, in conjunction with the Government's press release, the Parties filed the instant Motion. Doc. #149. The Motion asks the Court to issue an order under Rule 41(a)(2) dismissing this action with prejudice and retaining the Court's jurisdiction over the parties to enforce the terms of their settlement agreement. *Id.* For the reasons set forth below, the Court must deny the Motion.

## I.    The Motion Asks the Court to Enter a Consent Decree, Which Obligates the Court to Conduct an Analysis into the Reasonableness of the Terms of the Settlement Agreement.

Under Rule 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Thus, unlike with respect to the CFPB's claims, which were dismissed pursuant to Rule 41(a)(1)(A)(ii) without any court intervention, Doc.

#150, the Parties here affirmatively seek a stamp of approval from the Court, including a finding

that the terms of the parties' request are "proper." *See Kokkonen v. Guardian Life Ins. Co. of Am.*,

511 U.S. 375, 381 (1994) (under Rule 41(a)(2), court has discretion in evaluating terms of

proposed dismissal order); *see also Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico,* 311

F.3d 1031, 1047-49 (10th Cir. 2002) (district court abused discretion in granting joint request for

dismissal under Rule 41(a)(2) where dismissal prejudiced third parties).

The scope of a Rule 41(a)(2) inquiry depends on what relief the parties request from the

Court. In some circumstances, a dismissal order Rule 41(a)(2) constitutes a consent decree. *See,*

*e.g.*, *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 870-71 (6th Cir. 2015). "A consent

decree is essentially a settlement agreement subject to continued judicial policing." *Williams v.*

*Vukovich,* 720 F.2d 909, 920 (6th Cir. 1983); *see also United States v. City of New Orleans*, 731

F.3d 434, 438-39 (5th Cir. 2013). "Because a consent judgment has a continuing [e]ffect on the

rights of litigants, courts are required to ascertain whether the parties['] agreement 'represents a

reasonable factual and legal determination based on the facts of the record.'" *Bayou Fleet, Inc. v.*

*Alexander*, 234 F.3d 852, 858 (5th Cir. 2000) (quoting *United States v. City of Miami,* 664 F.2d

435, 441 (5th Cir. 1981) (*en banc*) (Rubin, J.)).

*Pedreira*—the only federal court of appeals decision to address the circumstances under

which a district court order dismissing a case under Rule 41(a)(2) constituted a consent decree—

is informative. In *Pedreira,* the Sixth Circuit considered a dismissal order that the district court

granted pursuant to Rule 41(a)(2) under which the court retained jurisdiction of the matter to

enforce the terms of the settlement. *Id.* at 870–71. The district court had not considered the

dismissal order as a consent decree, in part because the agreement drafted by the parties

expressly stated that it was *not* a consent decree. *Id*. at 871-72. The Sixth Circuit reversed. It held

10

that the Rule 41(a)(2) dismissal order at issue was functionally a consent decree because the court retained jurisdiction to enforce compliance with the settlement and in doing so gave "its imprimatur to the settlement's terms." *Id.* at 871. As to the settlement's recital that it was "Not [sic] Consent Decree," the court reasoned, "the agreement protests too much . . . in any event our precedents, and not the parties' recitations (even as incorporated by the district court), determine whether an order is a consent decree." *Id.* at 871–72. As a result, the court held that the district court erred in not considering the reasonableness of the settlement agreement and objections from third parties and reversed and remanded for further proceedings. *Id.*

Although the Fifth Circuit has not squarely addressed this issue under Rule 41(a)(2), it has held that judicial imprimatur is invoked when, as requested here, the court retains jurisdiction. *See Miraglia v. Bd. of Supervisors of Louisiana State Museum*, 901 F.3d 565, 577 (5th Cir. 2018). *Miraglia* considered whether a court's retention of jurisdiction was equivalent to a consent decree for purposes of a prevailing party and attorneys' fees analysis. It held that, even though the district court dismissed Miraglia's equitable claims as moot, it had retained jurisdiction over the claims to ensure compliance and this action "amounted to 'judicial imprimatur.'" *Id.* at 576–77; *see also id.* at 577 (the "dispositive feature . . . was that the district court[] retained jurisdiction to ensure compliance."); *see also Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320 (11th Cir. 2002) ("[T]he explicit retention of jurisdiction or the court's order specifically approving the terms of the settlement are . . . the functional equivalent of the entry of a consent decree."); *Roberson v. Giuliani*, 346 F.3d 75, 83 (2d Cir. 2003) ("[T]he district court's retention of jurisdiction . . . is not significantly different from a consent decree and entails a level of judicial sanction[.]"); *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002).

11

Here, the Parties request that the Court enter the equivalent of a proposed consent decree. Specifically, the Parties ask the Court to issue an order ("Proposed Order") under Rule 41(a)(2) dismissing the United States' claims against Defendants with prejudice and "retain[ing] jurisdiction over the parties to enforce the terms of their settlement agreement." Doc. #149-2. Under well-settled law, the "dispositive" feature is the Parties' request that the court retain jurisdiction even after the case is dismissed. *Miraglia*, 901 F.3d.at 577. That the order is not billed by the parties as a consent decree does not matter. What matters is that the parties seek the ability to enforce the terms of the settlement through this Court and that the order, if granted, would "put[] 'the power and prestige of the court behind the compromise struck by the parties.'" *Pedreira*, 802 F.3d at 871 (quoting *Williams,* 720 F.2d at 920).

In these circumstances, then, Rule 41(a)(2) requires that the Court scrutinize the reasonableness of the agreements' terms before agreeing to an order that would carry the imprimatur of the judiciary. In so doing, it will find ample ground to deny the motion.

## II.    The Court Should Not Approve the Motion Because the Immigration Enforcement Funding Clause Is Unrelated to the Pleaded Allegations and Causes of Action and the Agreement Unreasonably Affects Third Parties.

The Fifth Circuit has made clear that district courts independently must scrutinize proposed consent decrees. *See City of Miami,* 664 F.2d at 440 (courts presented with proposed consent decrees "must not merely sign on the line provided by the parties"). "A consent decree must arise from the pleaded case and further the objectives of the law upon which the complaint is based." *Bayou Fleet*, 234 F.3d at 858 (quoting *League of United Latin Amer. Citizens v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993)). Importantly, "[w]hen litigants reach a settlement that also [a]ffects third parties, 'the court must be satisfied that the effect on them is neither unreasonable nor proscribed.'" *Id.* (quoting *City of Miami*, 664 F.2d at 441).

12

Applying the appropriate standard to the Motion, the Court must (1) determine whether the terms of the Agreement arise from the allegations in the complaint and further the objectives of the FHA or the ECOA, and (2) analyze the Agreement's effect on third parties. Both considerations weigh strongly against approval.

### A. The Immigration Enforcement Funding Clause Does Not Arise from the Pleaded Case and Does Not Further the Aims of the Statutes Under Which It Was Filed.

The Agreement fails the first inquiry. The Supreme Court has made clear that a "consent decree must 'com[e] within the general scope of the case made by the pleadings,' and must further the objectives of the law upon which the complaint was based." *Firefighters*, 478 U.S. at 525 (alteration in original) (quoting *Pacific R. Co. v. Ketchum*, 101 U.S. 289, 297 (1880)). If not, it violates the obligation that a consent decree "spring from and serve to resolve a dispute within the court's subject-matter jurisdiction." *Id.*[3]

Here, the Immigration Enforcement Funding Clause does not arise from the allegations in this case. As the Court is well aware, this case is about predatory, seller-financed mortgages that Defendants targeted at vulnerable communities. It is *not* about immigration enforcement. Among the 15 different forms of relief sought by the complaint, none involve injunctive or monetary relief related to immigration or law enforcement. The factual pleadings do not focus on immigration or law enforcement, either. The complaint does not, for example, allege that Defendants targeted undocumented immigrants or encouraged immigration, nor does it allege that Defendants' discriminatory scheme relied on or was facilitated by the immigration status of its victims. It does not mention any inadequacies that law enforcement faced in Defendants'

---

[3] *Firefighters* recognized that a consent decree may "provide[] broader relief than the court could have awarded after a trial." 478 U.S. at 525. That recognition "does not enlarge the court's latitude" to issue relief that does not spring from the underlying dispute over which it has jurisdiction. *Lelsz v. Kavanagh*, 807 F.2d 1243, 1252 (5th Cir. 1987).

13

subdivisions. Nor does it allege that Defendants were able to prey upon consumers due to inadequate law enforcement resources or that law enforcement, or a lack thereof, played any role in Defendants' scheme. In fact, in the 45-page complaint, the terms "law enforcement" and "illegal immigration" appear precisely zero times. These issues also did not arise in the Parties' briefing on the motion to dismiss or in any other briefing presented to the Court in this litigation. And that is unsurprising, because, as described further below, immigration enforcement has no connection with the fair lending laws under which this suit was brought.

The Court may not approve and enforce the Clause because it does not arise from the dispute within its subject-matter jurisdiction. The Fifth Circuit has warned that "[c]ourts must be especially cautious when parties seek to achieve by consent decree what they cannot achieve by their own authority. Consent is not enough when litigants seek to grant themselves powers they do not hold outside of court." *Clements*, 999 F.2d at 846. "For example, a local government may not use a consent decree to avoid a state law requiring a referendum before the issuance of construction bonds." *Id.* (citing *Dunn v. Carey,* 808 F.2d 555, 560 (7th Cir. 1986)). Here, the Clause circumvents the ordinary process for funding immigration enforcement, avoiding the checks and balances of budgeting and appropriation. Even if the Government could obtain this relief in some hypothetical lawsuit involving other causes of action, this is not that case. Under this Circuit's law, the Court may not approve and enforce the Clause.

The Clause also does not further the objectives of the laws on which the complaint was based. Congress enacted the FHA and the ECOA to prevent discrimination in housing and credit transactions respectively. *See* 42 U.S.C. § 3601; 15 U.S.C. § 1691. "Ensuring equal access to credit is not only a legal mandate—it strengthens communities, serves the public, and advances

economic justice." *United States v. Essa Bank & Tr.*, No. CV 23-2065, 2025 WL 2087776, at *4 (E.D. Pa. July 23, 2025).

To state the obvious, the purpose of the civil rights statutes is not to enforce the nation's immigration laws. Under this Circuit's law, federal anti-discrimination laws like the FHA and the ECOA protect the rights of undocumented immigrants as well as those of citizens and documented immigrants. *See, e.g.*, *Cazorla v. Koch Foods of Mississippi, L.L.C.*, 838 F.3d 540, 556 n.50 (5th Cir. 2016) (immigration status does not affect right to relief in Title VII cases). Put another way, these statutes "continue to prohibit discrimination based on race and national origin, regardless of any change in the Executive Administration." *Essa Bank*, 2025 WL 2087776, at *4 (denying request jointly filed by DOJ and defendant to terminate consent decree prematurely).

There are many federal statutes that address immigration and law enforcement-related concerns. *See, e.g.*, 8 U.S.C. § 1324. This case was not brought under those statutes. Because there is no nexus between the Government's complaint and immigration or law enforcement, the Court must find that the Immigration Enforcement Funding Clause fails scrutiny.[4]

### B. The Agreement Negatively Affects the Victims of Defendants' Scheme.

The Proposed Order also fails the second inquiry, the consideration of third-party interests. Here, Defendants' contribution of $20 million to fund immigration enforcement within the Colony Ridge subdivisions negatively affects the very people whose rights the complaint was filed to vindicate. Instead of providing relief to the victims of Defendants' predatory scheme, the

---

[4] The complaint also alleged claims under the CFPA and ILSA brought by the CFPB. Those claims have been voluntarily dismissed, *see* Doc. #150, and thus do not form a basis for any of the relief sought by the United States. In any event, those claims allege failures to comply with ILSA's reporting, disclosure, and translation requirements and its prohibition on making untrue statements and omitting material facts, and the CFPA's prohibition on deceptive acts or practices, Doc. #1 ¶¶ 167–86, and therefore do not relate to the Clause.

settlement agreement could subject some of them to increased risk of potential detention, family separation, or deportation, while creating an atmosphere of heightened surveillance within the community.

The complaint estimates that Defendants' discriminatory scheme victimized tens of thousands of consumers who lost substantial sums of money. In particular, lot purchasers who suffered foreclosure lost thousands of dollars, with little or nothing to show for their investments. As set forth *supra*, Defendants' seller-financed mortgages included exorbitant interest rates, did not account at all for borrowers' ability to repay, and came with burdensome late fees. A deliberate result of these predatory terms was a rate of foreclosure within three years that was approximately 15 times the national average. Doc. #1 ¶ 11. As this Court held at the motion to dismiss stage, these characteristics distinguish Defendants' seller-financed mortgages as predatory. *Colony Ridge Dev., LLC*, 2024 WL 5183711, at *5.

This suit was filed to achieve redress for these borrowers. The complaint explicitly sought relief for borrowers in the form of redress to "consumers and aggrieved persons" and "rescission or reformation of contracts obtained." Doc. #1 at 43–44. Indeed, victims of similar discriminatory schemes have received considerable compensation for their injuries. *See e.g., Saint-Jean*, 129 F.4th at 133 (four plaintiffs targeted with predatory loan product awarded $722,044 by jury); *see also* 42 U.S.C. § 3614(d)(1)(B) (courts "may award . . . monetary damages to persons aggrieved" in FHA cases brought by the Attorney General).

This lawsuit represented the only realistic prospect for many customers to get back the money they lost to Defendants' predatory scheme—yet the Agreement does not include *any* direct financial relief for consumers or injunctive relief reforming existing contracts. In fact, the Agreement is striking in how little it does for the victims of the scheme. For example, while the

Agreement creates a rescission option for future borrowers, the provision does nothing for existing consumers stuck in predatory contracts. Doc. #149-1 ¶ 16(d). The Agreement also includes a commitment to provide infrastructure that is needed to make the properties habitable. But it does not address the harm to the borrowers who purchased lots believing that they would not flood only to find that they did, or those who are stuck with unhabitable, flooded lots for the duration of the ten-year period it may take for Defendants' infrastructure to be created, if they are lucky enough to be able to continue affording their payments in the meantime.

Victims of Defendants' scheme theoretically could vindicate their own rights in court through private enforcement, but in practice, the Government's decision to settle this case without providing adequate relief forecloses the possibility that they will be made whole. Low-income people with limited English proficiency—like many of the customers targeted by Defendants—face myriad barriers to justice in the civil system, including difficulty finding and affording attorneys to represent them. Moreover, even if defrauded customers could find and afford an attorney, many of their claims may be barred by the applicable statutes of limitation. *See* 42 U.S.C. § 3613(a)(1)(A) (two-year statute of limitations for FHA claims). And this suit, which was supposed to vindicate their rights, misled anyone who otherwise might have sued within the limitations period into thinking such an action unnecessary.

There is no evidence on the record that $20 million in increased law enforcement funding is targeted to improve the lives of the victims of the predatory scheme in any way, much less in a manner that is responsive to the specific harm alleged. Again, the complaint does not allege that gaps in funding for law enforcement contributed to Defendants' ability to perpetrate the scheme. And contrary to the mischaracterizations contained in Assistant Attorney General Dhillon's press release announcing the settlement, there is no connection whatsoever between illegal

17

immigration and the actions taken by Defendants in this case. The Immigration Enforcement Funding Clause is therefore untethered to the harms that animated the suit, and any purported benefit the parties may claim it will bring to third parties is unsubstantiated and beyond the scope of this litigation.

The Government has discretion over how it chooses to litigate and settle cases. But the Government does not have the authority to dictate that the Court give its imprimatur to or exercise jurisdiction over settlement agreements that depart from the pleaded case. When, as here, the agreement seeks relief that fails to compensate victims for the injuries they suffered and has nothing to do with the claims brought, the Court must decline the parties' request.

## III.    The Court Should Deny the Motion or, in the Alternative, Strike or Refuse to Enforce the Immigration Enforcement Funding Clause.

Based on the foregoing analysis, the Court should deny the Motion. Where a proposed consent decree contains an improper term, like the Immigration Enforcement Funding Clause, the default remedy is to refuse to issue the decree. *See, e.g.*, *United States v. State of Colorado*, 937 F.2d 505, 509 (10th Cir. 1991) ("While the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties. . . . If the court discerns a problem with a stipulated agreement, it should advise the parties of its concern and allow them an opportunity to revise the agreement." (citing *City of Miami,* 664 F.2d at 441)). That remedy is particularly warranted here because the Agreement as a whole—not just the Clause—negatively affects victims of Defendants' scheme by denying them meaningful relief.

In the alternative to denial, however, a court may strike a term from a proposed consent order or refuse to enforce a particular term thereof. In *Bayou Fleet*, the district court amended a consent decree by deleting a reference in the decree to a zoning restriction. 234 F.3d at 858–59.

18

The Fifth Circuit affirmed, holding that (1) the zoning issue was not raised in the pleadings, and (2) the decree implicated third parties' rights to enforce the zoning restriction in state court. *Id.* Like the zoning reference in *Bayou Fleet*, the Immigration Enforcement Funding Clause is untethered from the pleadings and negatively affects the interests of third parties. Here, striking or refusing to enforce the Clause would address some of the Agreement's deficiencies, but it would not remedy the Agreement's central shortcoming: failure to provide meaningful relief to victims of Defendants' predatory scheme. Nevertheless, in the alternative to denial of the Motion, the Court may strike the Clause from the Agreement or amend the Proposed Order to specify that it will not enforce the Clause.

## CONCLUSION

The Court should not rubber-stamp the Parties' Proposed Order. The Court must independently assess the reasonableness of the Agreement, including the Immigration Enforcement Funding Clause. The Clause is unrelated to the facts and legal claims alleged and is an insult to the vulnerable community that was targeted by this predatory scheme. The Agreement as a whole does not provide relief appropriate for the injuries alleged. Instead, the Clause appears intended to subject them to heightened surveillance, and, for some, could subject them to potential detention, family separation, or even deportation—prioritizing the Government's unrelated political priorities over the victims' interests. Accordingly, the Court should deny the Motion.

Dated: March 3, 2026        Respectfully Submitted,

/s/ Yiyang Wu
Yiyang Wu **
Nicholas Abbott *
Relman Colfax PLLC

19

1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888

Elena Goldstein **
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 488-9090

Janell M. Byrd **
Sasha Samberg-Champion **
National Fair Housing Alliance
1331 Pennsylvania Avenue NW, Suite 650
Washington, DC 20004
(202) 898-1661

*Attorneys for Amici*

\* Admitted *Pro Hac Vice*
\*\* Applications to Appear *Pro Hac Vice*
submitted to Court pursuant to Local Rule
83.1(I)

20

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2026, a true and accurate copy of the foregoing memorandum was electronically filed with the Court using the CM/ECF system. Service on counsel for all parties will be accomplished through the Court's electronic filing system.

<u>/s/ Yiyang Wu</u>

*Attorney for Amici*

Date:   March 3, 2026