**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU** and **UNITED STATES OF AMERICA**, | § § § § § § § | |
| *Plaintiffs,* | § § | |
| vs. | § § | **Case No. 4:23-cv-4729** |
| **COLONY RIDGE DEVELOPMENT, LLC, d/b/a Terrenos Houston, Terrenos Santa Fe, and Lotes y Ranchos; COLONY RIDGE BV, LLC; COLONY RIDGE LAND, LLC, formerly d/b/a Terrenos Houston** and **Lotes y Ranchos; and LOAN ORIGINATOR SERVICES, LLC**, | § § § § § § § § § § | |
| *Defendants.* | § | |

**COLONY RIDGE'S RESPONSE TO MEMORANDUM OF AMICI CURIAE**

**INTRODUCTION**

Colony Ridge agreed to a global resolution of the claims against it not out of fault—indeed, Colony Ridge unequivocally denies that it has violated any law, *see* ECF No. 149-1 ¶ 5—but because the settlement is in the best interest of Colony Ridge and the residents it has diligently served since 2011. Although amici curiae contend in their belated filing that the settlement is insufficient to punish Colony Ridge for its alleged wrongdoing, their ignorance of this matter is reflected in their heavy reliance on unproven pleading-stage allegations. As explained below, those allegations would have faced serious headwinds at trial, because Colony Ridge was factually and legally well-positioned to defend its business model throughout all stages of the case. The parties' settlement reflects these risks.

Amici and Colony Ridge do agree in one crucial respect: homeownership is the "bedrock of the American dream." ECF No. 160 at 4. That starts with owning land. Colony Ridge is enormously proud to have expanded opportunities for families who lack access to the traditional pathways to homeownership. The parties' settlement, which Colony Ridge has already begun implementing, will allow Colony Ridge to offer better prospects for homeownership to thousands of hardworking Texas residents.

The Court should grant the parties' joint motion for dismissal.

**ARGUMENT AND AUTHORITIES**

**I.    Amici's Complaints are Drawn from Incorrect, Uneducated Allegations.**

In their memorandum, ECF No. 160-2, amici present a confidently incorrect account of Colony Ridge's alleged misconduct. Every inflammatory assertion that they advance—among others, predatory mortgages, exorbitant interest rates, and material misrepresentations in advertising—is drawn from the United States' complaint. *Id.* at 2-6. Of course, this case has not proceeded to summary judgment, let alone to trial. At the motion to dismiss stage, the Court had

to, and did, accept the government's well-pleaded facts as true. ECF No. 93 at 6 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But the fact that the United States largely survived Colony Ridge's motion to dismiss did not "pave[] the way for a substantial settlement that would achieve the relief sought in the complaint and vindicate the interests of consumers victimized by Defendants." ECF No. 160-2 at 7. All the ruling did was allow this case to proceed to discovery. And it did: before entering settlement conversations and pausing active litigation, the parties exchanged over a million pages of documents, including nearly everything in Colony Ridge's files about its development investment, state and local permitting and compliance successes, and sales and financing justification; Colony Ridge answered over a dozen interrogatories and hundreds of requests for admission; and the parties were proceeding apace with the retention of expert witnesses. *See* ECF No. 167 at 3.

After the completion of that discovery, a very different story emerged than the one the United States alleged and amici portrayed in their submission. In discovery, Colony Ridge demonstrated that it has long offered traditionally disenfranchised customers a chance to own property and live their own version of the American dream. In 2011, Colony Ridge started as a single tract of land in an incorporated part of Liberty County. Today, Colony Ridge is comprised of roughly 40,000 lots spread across six residential subdivisions.

Through Colony Ridge, customers can own a piece of land to develop over time as they see fit. Colony Ridge's residents are primarily Spanish-speaking working-class families who have relocated from the Houston area because of the opportunity for low-cost property ownership that is difficult to find in today's real estate market. Many residents start with pre-development lots, which average $40,000 for a 1/3 acre lot with few building restrictions and the promise of road frontage, access to water, sewer, and electric service, and a low-cost homeowner's association that

assists residents in developing their lot as they see fit. All purchasers are required to make at least one in-person visit to walk on the lot they are purchasing before they may sign a sales contract. From there, buyers may pay in cash or arrange for their own traditional bank financing. If buyers do not have access to traditional bank financing, Colony Ridge offers buyers in-house financing. These buyers are provided a straightforward, federally required loan estimate and detailed disclosures, and all must wait a mandatory seven-business day period before the sale closes. The non-negotiable loan options for buyers are set out in the table below.

|  | Option 1 | Option 2 | Option 3 |
|---|---|---|---|
| **Term** | 20 years | 20 years | 20 years |
| **Down Payment** | 1%-9.99% | 10%-14.99% | 15% or more |
| **Interest Rate** | 12.90% | 11.90% | 10.90% |

The loan terms have been the same for over a decade, even though conventional home mortgage rates fluctuated more than 125% over the same time period. The first option (with the lowest downpayment required) is by far the most popular among Colony Ridge's customers. Because Colony Ridge Development develops and sells the land and Colony Ridge Land offers financing to borrowers on the same land, many of the traditional barriers to land purchase are not required. Borrowers are not charged for and are not required to obtain an appraisal, a survey, a title policy or title insurance, pay a broker's sales commission, or put funds in escrow for taxes and insurance. All loan origination fees and document recording fees are paid for by Colony Ridge Land, not the buyer. Colony Ridge thus incurs at least $2,500 in transaction costs for each lot it sells: it pays 5-7% in various sales commissions, third-party loan origination fees, document recording fees, and other administrative transaction costs.

Compare all this to traditional bank financing on raw land, which generally requires at least 20% down and carries large loan origination fees (usually .5% to 1% of the loan), title policy/insurance costs (again, usually .5% to 1% of the loan ), survey costs ($500 - $1000), and similar transaction costs (appraisal fees, application fees, credit report fees, escrow fees, bank processing fees, closing attorney fees, document recording and notary fees) that would require more than $10,000 to be brought to the closing table for a $40,000 lot. All told, for many customers, financing through Colony Ridge Land is a more attractive option than bank-initiated financing.

Residents have used the stable platform of Colony Ridge landownership to establish their homesteads, launch businesses, develop after-school programs, and open religious congregations. Colony Ridge's investment in that community goes well beyond selling lots. For example, Colony Ridge:

- donated land to the Cleveland Independent School District and the International Leadership of Texas charter school network to enable and support the construction of six schools, with additional expansions to accommodate the community's growth;

- worked with the State to establish a Municipal Management District to oversee long-term infrastructure planning, including road construction, drainage maintenance, and other public works essential to sustaining a large-scale community;

- partnered with the community's homeowners' association to maintain parks, green spaces, sports fields, splash pads, and a central administration building that hosts weekly community events, and provide robust guidance and support for residents to develop their property in compliance with Liberty County permitting and tax authorities; and

4

- funded ten full-time sheriff's deputies and three full-time constables dedicated exclusively to the six Colony Ridge subdivisions. This commitment long predates the United States' lawsuit.

Notwithstanding these achievements, the amici falsely characterize Colony Ridge as an enterprise designed to strip families of their dreams. *E.g.*, ECF No. 160-2 at 5-6. That characterization cannot be squared with what Colony Ridge has actually built, or with the thousands of families who have put down roots, raised children, and established businesses in the community. Those families are Colony Ridge's reason for existing. The amici, who have not intervened, not conducted discovery and not even spoken to Colony Ridge's leaders, are in no position to say otherwise.

## II. Amici's "Predatory Lending" Characterization Rests on Flawed Comparison Between Fundamentally Different Loan Products.

Echoing the government's factually incorrect allegations, amici cast Colony Ridge's loans as "predatory." *E.g.*, ECF No. 160-2 at 9, 13. The United States alleged Colony Ridge Land's interest rates were "significantly higher than typical prevailing rates," thereby inaccurately equating interest rates for lot purchases with the interest rates for conventional government-backed "home loans." ECF No. 1 ("Compl.") ¶¶ 72-73. That comparison, explained in Colony Ridge's motion to dismiss, is not correct (Colony Ridge interest rates are consistent with other lot loan rates) or appropriate (Colony Ridge interest rates cannot be fairly compared to traditional mortgage bank home loan rates). *See* ECF No. 50 at 8-9.

At bottom, the two products are fundamentally different in ways that make any interest rate comparison invalid. *See generally In re Club Assocs.*, 107 B.R. 385, 403 (Bankr. N.D. Ga. 1989), *aff'd*, 956 F.2d 1065 (11th Cir. 1992). A conventional home mortgage is government-backed— that is, government subsidized through insurance and risk-sharing—and finances the purchase of

a borrower-occupied dwelling, so mortgagors have every incentive to make payments. After all, default means loss of their home. Federal law regarding government-backed home mortgages also requires lenders to conduct extensive underwriting: for example, verifying income, assessing debt-to-income ratios, and reviewing credit history. *See, e.g.*, 78 Fed. Reg. 6408, 6408-09 (Jan. 30, 2013). None of these is required or even encouraged for private raw land loans, and the United States has never shown otherwise throughout this litigation. All of these prerequisites exist because the conventional home loan market is heavily regulated, government-supported, and designed to serve borrowers with established financial profiles. *See United States v. Winstar Corp.*, 518 U.S. 839, 844 (1996) (emphasis added) ("Banking is one of the longest regulated and most closely supervised of public callings." (citation omitted)).

A Colony Ridge lot loan, by contrast, finances the purchase of raw, vacant land with no existing structure and no government guarantee. The borrower is not required to occupy the property or prove their ability to repay the loan. The risk of default and loss is substantially higher to Colony Ridge than mortgage bank lenders, because Colony Ridge's collateral is undeveloped unoccupied land and the conventional loan market has already refused to serve the borrower in a meaningful way. The interest rates Colony Ridge charges—well below the 18% maximum permitted by Texas law, *see* Tex. Fin. Code §§ 303.008, .009(a)—reflect these additional risks. In that context, Colony Ridge's interest rates are the product of rational pricing in a private market segment that conventional lenders have largely abandoned and neglected to serve. *See In re Club Assocs.*, 107 B.R. at 403 ("The seller-lender often has more flexibility than a conventional lender in arranging financing for a purchaser.").

For these reasons, the Court should not acknowledge, much less accept, amici's incorrect criticism that Colony Ridge's loans are "predatory." Seller-financing land development is a fully

6

regulated industry, and Colony Ridge's loan operations are subject to regular examination and audit by the Texas Department of Savings and Mortgage Lending. That agency performed an examination of Colony Ridge's loan operation as late as 2025, as well as an eight-month audit in 2021 that included a Texas Department of Housing and Community Affairs investigator. Prior to this lawsuit, no state or federal agency has ever found fault with Colony Ridge's interest rates (which are lawful and customary for this industry), its lack of loan underwriting requirements (again, lawful), its foreclosure rate (standard in the industry), or its late fees (which are below the usual and customary industry rate). Unlike amici, the Texas Department of Savings and Mortgage Lending and Texas Department of Housing and Community Affairs understood that Colony Ridge operates within the law.

**III.    The Settlement's Terms Are Fair, Appropriate, and Related to the United States' Claims; Colony Ridge Is Already Taking Meaningful Steps Towards Compliance.**

While the parties' joint motion for dismissal has been pending, Colony Ridge has already begun implementing the settlement agreement. Colony Ridge recently presented two compliance specialists for the United States's and Texas's non-objections. The first, Doug Foster, will oversee Colony Ridge's obligations under Part C of the settlement (Prohibition Against Discrimination); Part E (Underwriting Standards, Default Avoidance, and Foreclosure Policy); Part F (Truthful Advertising and Disclosures); Part J (Training, Nondiscrimination Policy, and Complaint Procedure); and Part K (Reporting and Recordkeeping). *See* Ex. A at 1 (Statement of Work and Qualifications of Compliance Specialist Doug Foster). Mr. Foster brings more than 40 years of regulatory, compliance, lending, consumer-protection, and supervisory experience to the position, including serving as a former Texas Commissioner of Savings & Mortgage Lending. *Id.*

The second compliance specialist, 5engineering, will oversee Colony Ridge's compliance with Section IV, Part G of the settlement, which includes Colony Ridge's infrastructure and flood

control plan obligations. *See* Ex. B at 1 (Statement of Work and Qualifications of Compliance Specialist 5engineering). Like Mr. Foster, 5engineering is eminently qualified: it is a Texas-based civil engineering firm specializing in water resources, drainage, stormwater management, flood-control engineering, roadway design, utility infrastructure, and municipal capital projects. *Id.* at 1.

The settlement imposes substantial, wide-ranging obligations that Colony Ridge will expend significant resources to implement (which Mr. Foster and 5engineering will soon monitor):

- $48 million in infrastructure investment, including $18 million dedicated specifically to improve drainage and flood control (related to Compl. ¶¶ 123-125);

- revised advertising and disclosure requirements (related to Compl. ¶¶ 3-4);

- a default avoidance plan to meaningfully reduce the overall foreclosure rate (related to Compl. ¶¶ 127-131); and

- fair lending training and a nondiscrimination policy with a formal complaint procedure (related to Compl. ¶¶ 154, 161-162, 188-197).

These obligations extend for three to ten years and require extensive ongoing reporting. *See* ECF No. 167 at 3-4 (summarizing key aspects of the parties' agreement). Colony Ridge agrees with the United States that these provisions provide "robust and meaningful protections for residents." *Id.* The ironic but unfortunate practical effect of amici's eleventh hour request would be confusion and delay in the enactment of these important measures.

Notwithstanding these immediate and long-term consumer benefits, amici express concern that past customers who may have been harmed will receive no individual financial relief. ECF No. 160-2 at 16-17. Apart from amici's acknowledgement that restitution is permissive and not mandatory under the Fair Housing Act, *see id.* (citing 42 U.S.C. § 3614(d)(1)(B)), significant relief *is* being provided to customers that were allegedly harmed. The United States' decision not to seek

8

backwards-looking monetary relief cannot be evaluated solely against the Court's ruling on Colony Ridge's motion to dismiss, as amici urge. *See id.* Instead, the Court should and must consider the defenses that Colony Ridge would have proffered: among them, that reverse redlining has never been recognized as a viable theory of relief in the Fifth Circuit, *see* ECF No. 99 at 1, 7; that the comparison between Colony Ridge's lot loans and conventional home mortgages is analytically flawed and factually misleading; and that the United States conceded that Colony Ridge's financing terms were the same for every customer regardless of race or national origin, *see* Compl. ¶¶ 71-72, 74, 78-81. Litigation on those issues would have been complex, expensive, and protracted, and with no guarantee of the outcome that the amici assume to be a foregone conclusion.

Colony Ridge agreed to provide significant and meaningful financial relief to consumers. For example, borrowers who have defaulted on their loans are entitled to have Colony Ridge remove all negative credit reporting associated with those loans. ECF No. 149-1 ¶ 17. Even more noteworthy, the settlement requires Colony Ridge to provide short-term, interest-free loans to qualified borrowers for unpaid taxes, property owners' association dues, and other qualifying debts, representing an extension of additional and substantial credit on terms no arm's-length lender would likely offer. *Id.* ¶ 17(c).

Amici nonetheless complain that these steps are insufficient, in part relying on Colony Ridge's raw land foreclosure rate, which they contend is significantly higher than the home mortgage foreclosure rate. *See* ECF No. 160-2 at 4. Ignoring again that a comparison of raw land sales and home mortgages is nonsensical, amici are unaware of the circumstances that led to those purported foreclosures. Discovery revealed that many "foreclosures" resulted after a buyer made two monthly scheduled payments or fewer. Because Colony Ridge incurs at least $2,500 in

transaction costs on every sale, *see supra* p. 3, these foreclosures, which function more like rescissions, are costly for all parties involved. To address those situations, Colony Ridge agreed to provide borrowers with the ability to fully rescind their purchase contract and recover all monies paid to Colony Ridge by the latest due date of the second payment after closing on a lot loan, under usual circumstances. ECF No. 149-1 ¶ 16(d). This relief is a direct response to the United States' complaint that buyers simply do not understand what they are getting into, Compl. ¶¶ 91-92, despite: 1) being required to walk on the property prior to their purchase; 2) signing or initialing clear and concise disclosures required by law; and 3) abiding by a seven day "cooling off" period prior to signing any finance documents.

In total, these are not trivial concessions. They are affirmative financial benefits that will cost Colony Ridge millions of dollars and that run directly to the very consumers the amici claim the settlement ignores. Similarly, in response to the United States' complaint that Colony Ridge was engaging in "equity scraping" of longtime landowners, Compl. ¶¶ 131-132, the settlement formalizes Colony Ridge's longstanding informal policy of allowing distressed owners to have a willing and able buyer simply assume the distressed owner's mortgage note. ECF No. 149-1 ¶ 16(c).

Finally, amici claim that additional relief should be granted for those "defrauded." ECF No. 160-2, Page 2, 17. This argument incorrectly assumes, however, that someone was defrauded at all. Colony Ridge denied those allegations in the strongest possible terms and was prepared to litigate those defenses through trial, if necessary. Ultimately, the parties with the legal authority and obligation to secure relief for aggrieved persons—the United States and the State of Texas— weighed all these realities, the significant discovery that the parties undertook (which amici have not seen), and determined that the comprehensive settlement agreement, ECF No. 149-1,

10

appropriately serves the interests of Colony Ridge's community. Their judgment is entitled to deference.

CONCLUSION

The parties' joint motion for dismissal should be granted.

Dated: March 23, 2026.                                    Respectfully submitted,


_Jason Ray_

Jason Ray
TX Bar No.: 24000511
jray@r-alaw.com
**RIGGS & RAY, P.C.**
3307 Northland Dr., Suite 215
Austin, TX 78731
Tel.: (512) 457-9806
Fax: (512) 457-9066


Quentin Tate Williams
TX Bar No.: 24013760
tate@hilderlaw.com
Philip Harlan Hilder
TX Bar No.: 09620050
philip@hilderlaw.com
James Gregory Rytting
TX Bar No.: 24002883
james@hilderlaw.com
Stephanie K. McGuire
TX Bar No.: 11100520
stephanie@hilderlaw.com
**HILDER & ASSOCIATES, P.C.**
819 Lovett Blvd.
Houston, TX 77006
Tel.: (713) 655-9111
Fax:(713)655-9112

Judd E. Stone II
TX Bar No.: 24076720
judd@stonehilton.com
Christopher D. Hilton
TX Bar No.: 24087727
chris@stonehilton.com
Ari Cuenin
TX Bar No.: 24078385
ari@stonehilton.com
Alexander M. Dvorscak
TX Bar No.: 24120461
alex@stonehilton.com
Michael Abrams
TX Bar No.: 24087072
michael@stonehilton.com
Cody C. Coll
TX Bar No.: 24116214
cody@stonehilton.com
**STONE HILTON PLLC**
600 Congress, Suite 2350
Austin, TX 78701
Tel.: (737) 465-3897

**ATTORNEYS FOR DEFENDANTS**
**COLONY RIDGE DEVELOPMENT, LLC,**
**COLONY RIDGE BV, LLC, AND**
**COLONY RIDGE LAND, LLC**

## CERTIFICATE OF SERVICE

I certify that on March 23, 2026, all counsel of record were served a true and correct copy of this document via the Court's the CM/ECF system.

_____
Jason Ray